## Case No. 16,642.

### UNITED STATES v. WARNER.

[4 Cranch, C. C. 342.][1]

Circuit Court, District of Columbia. Nov. Term, 1833.

CRIMINAL LAW — EVIDENCE OF BAD CHARACTER.

Upon an indictment for keeping a disorderly house, and for keeping a bawdy house, the United States cannot give evidence of the general character of the defendant.

The indictment [against Eliza Warner] had two counts: (1) For keeping a bawdy house. (2) For keeping a disorderly house.

Mr. Dunlop, for the United States, offered evidence of the general character of the defendant.

Mr. Z. C. Lee, for defendant, objected, and relied on the decision of this court in U. S. v. Jourdine [Case No. 15,499], at the September special court, 1833.

Mr. Dunlop, contra, cited 1 Hawk. P. C. c. 74.

THE COURT (MORSELL, Circuit Judge, contra) refused to permit the evidence to be given.

Verdict, not guilty.

---

## Case No. 16,643.

### UNITED STATES v. WARNER et al.

[4 McLean, 463;[2] 6 West. Law J. 255.]

Circuit Court, D. Ohio. Nov., 1848.

CONSTRUCTION OF STATUTES—NEGLIGENT NAVIGATION OF STEAMBOAT—MANSLAUGHTER—INDICTMENT—EVIDENCE—DUTY OF CAPTAIN.

1. In the construction of statutes, it is a rule of universal application, that effect must be given to the words used by the legislature, when there is no uncertainty or ambiguity in their meaning.

[Cited in Cross v. Seeberger, 30 Fed. 428.]

[Cited in brief in Cutler v. Currier, 54 Me. 88; Brackett v. Ridlon, Id. 430. Cited in Corsey v. Territory (N. M.) 32 Pac. 506; Buffham v. City of Racine, 26 Wis. 453.]

2. Congress having expressly provided in section 12, Act July 7, 1838 [5 Stat. 306], that any act of "misconduct, negligence, or inattention" on the part of those concerned in the steamboat navigation, producing death as a result, shall be deemed manslaughter, it is not necessary to aver, in an indictment framed upon it, or to prove on trial, a malicious intent in the persons charged—such intent not being made a necessary ingredient of the offense.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Hon. John McLean, Circuit Justice.]

3. The essence of the crime, under the section referred to, consists in the fact of there being "misconduct, negligence, or inattention" in such degree, and of such a character, as to have produced the result set forth in the indictment, irrespective of the intention of the persons charged.

4. In an indictment under said section, charging neglect of duty on the part of steamboat officers, whereby the boat came into collision with a schooner, and the former was sunk, and lives destroyed; if it appear that the accident was the result of misconduct, or unskillfulness of the persons in charge of the schooner, or that the collision was from any other cause, unavoidable, the defendants ought not to be convicted.

5. Under the second count of the indictment, to justify a verdict of guilty, the jury must be satisfied that the persons whose lives are averred to have been destroyed, came to their death by drowning, as a result of collision.

6. If the jury are satisfied, that the individuals whose lives were lost, having been apprized that they would be safe by remaining on the upper deck of the steamboat, and that in fact, those who remained there, were saved; under the influence of excessive alarm, unnecessarily and indiscreetly left the boat, when sinking, on floats or rafts, and were drowned; the loss of their lives is not so connected with, and a necessary result of collision, as that the defendants can be held responsible for such loss of life.

7. But, if the persons drowned conducted with ordinary prudence and discretion, in the circumstances in which they were placed, their deaths may be viewed as directly resulting from the collision, and the averment of the indictment in that respect, is supported.

[Cited in Denman v. State, 15 Neb. 141, 17 N. W. 348.]

8. It was the duty of the captain, with reasonable promptitude, to ascertain the extent of the injury to the boat, and upon the discovery being made that she would go down, without necessary loss of time to order the boat to be run ashore; and if, from indecision, or neglect, he failed in these duties, and the death of the passengers, or others, resulted from such delay, he is responsible for such result.

The defendants, viz. [Henry R.] Warner, as captain, [Cyrenius H.] Wishue as first mate, [Raymo] Demond as second mate, and [John] Kirby as wheelsman of the steamboat Chesapeake, then navigating Lake Erie, were jointly indicted for manslaughter, under the 12th section of the act of congress of the 7th of July, 1838, entitled, "An act to provide for the better security of the lives of passengers, on board of vessels propelled in whole or in part by steam." 5 Stat. 304. This section is in these words: "That every captain, engineer, pilot or other persons, employed on board of any steamboat, or vessel, propelled in whole, or in part, by steam, by whose misconduct, negligence or inattention, to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof, before any circuit court of the United States, shall be sentenced to confinement, at hard labor, for a period not more than ten years."

The indictment contains five counts, of which the following is a condensed statement: (1) Charges the defendants, in their respective capacities, with general misconduct, negligence, inattention, whereby the collision took place, the boat was sunk, and the lives of several persons destroyed. (2) Charges that it was the duty of the defendants to keep a lookout, and so to steer or navigate the boat, as to avoid collision, and that in their respective capacities, they neglected these duties, whereby the collision took place, the boat sunk, and the lives of Eli Cone, William N. Yerke, and David Folsom, were destroyed by drowning. (3) Charges, that it was the duty of the captain and mate, to keep a lookout, and to give orders to the wheelsman so to steer as to avoid collision, etc.; and that the captain and the mate neglected these duties, and the wheelsman neglected to steer, etc., whereby collision took place and lives were lost. (4) Contains substantially the same averments as the preceding, with the addition, that it was the duty of the defendants after the collision, to make an immediate examination of the injury; and that they neglected this duty, etc., whereby the boat sunk, and the lives of certain persons were lost. (5) Charges, that after collision, the defendants neglected their duties in the following particulars: First. In not causing an immediate examination to ascertain the extent of the injury to the boat. Second. In neglecting to close the ash-hole. Third. In neglecting to run the boat ashore, at the nearest and most convenient point without delay; whereby the boat sunk and lives were lost.

A motion for leave to the defendants to sever in their trial, and a motion to quash some of the counts of the indictment were overruled.

2 [Before the jury were called, the counsel for the defence moved the court for leave to the defendants to sever in their trials, stating it as his object, in asking for a severance, to use the defendants as witnesses for each other. But THE COURT refused to grant this leave, as against public policy, and not sanctioned by usage or authority. U. S. v. Gibert [Case No. 15,204]; U. S. v. Wilson [Id. 16,730]. The counsel then moved to quash the indictment, for reasons substantially as follows: (1) That the first count is defective, in not specifying any act of misconduct, negligence, or inattention. (2) That the first, third, fourth, and fifth counts are defective, in not stating the manner of the deaths of those whose lives are alleged to have been lost. (3) That the specific acts of misconduct, negligence, or inattention are not set forth with sufficient certainty in any of the counts. (4) That there is no allegation that the defendants were charged with joint duties, and, as their duties were necessarily distinct, involving no community of guilt in their violation, they cannot be jointly indicted; and that, if liable, they must be sever-

ally indicted, and each charged with such a violation of duty as is sufficient to produce the result alleged as the consequence of such violation.

[Swayne & Beecher, for defendants, cited, in support of the motion, Archb. Cr. Pl. 38; 5 Term R. 622; 1 Chit. Cr. Law, 220, 257; 1 Strange, 623; 2 Hawk. P. C. 89; 2 Mo. 530; 1 Denio, 232.

[T. W. Bartley, U. S. Dist. Atty., in opposition, cited Archb. Cr. Pl. 54; U. S. v. Lancaster [Case No. 15,556].

[THE COURT overruled the motion to quash; stating that, as all the grounds urged could be brought up hereafter on a motion to arrest judgment, if the result of the trial should render it expedient, it was not necessary now to go fully into their consideration. The court intimated, however, that the first count was defective on account of its vagueness and generality; and, also, that those counts were objectionable which did not describe the mode by which the persons alleged to have lost their lives came to their death; but, this latter objection n.y. applying to the second count, and that count being in other respects good, the indictment ought not to be quashed. The court also held that there was no foundation for the position that the defendants were improperly joined in the indictment.] [2]

The jury were then sworn to try the defendants Warner, Wishue and Demond. The defendant Kirby was not put on his trial, and as to him, the district attorney subsequently entered a nolle prosequi. (As it would occupy too much space to set forth separately and in detail, the testimony of the numerous witnesses sworn on the part of the prosecution, it is proposed to give, in brief an outline of their statements, which with the references to the evidence, contained in the charge of the court, as applicable to the different allegations in the indictment, will present a satisfactory view of all the material facts of the case.) In the afternoon of the 9th of June, 1847, the steamboat Chesapeake, with the defendants on board, in the several capacities before stated, left Buffalo, destined for Cleveland. Between 11 and 12 o'clock, in the night of that day, being about six miles from shore, and nearly opposite the harbor of Conneaut, the captain and first mate having retired to their berths, and the defendant Demond, as the second mate, being the officer on watch, and the defendant Kirby, at the wheel, the boat came in contact with the schooner John Porter, Captain Thomas, master, bound for Buffalo, striking her at nearly right angles, about midship, on her starboard side, and causing her to sink in from five to ten minutes after the collision; her crew being saved from immediate death by their transfer to the steam-

boat. It was very soon ascertained that a hole had been made on the larboard side of the bow of the boat, and that water was rapidly coming in. The pumps were immediately set to work, all hands ordered to bail, and attempts made to stop the leak; and the boat was put toward shore, heading for the light at Conneaut harbor, but the water gained so fast, that when within one and a half or two miles from shore, the fires were extinguished, and the engine ceased to work; and, in an hour and a half from the stopping of the engine, the boat sunk, in thirty-six feet water. There were about sixty cabin passengers on board, who with the steerage passengers, officers and crew, made the whole number between eighty and ninety. As the boat went down, the hurricane or upper deck broke, and became detached from the boat. This deck had been made fast by ropes to the mast of the boat, and remained stationary over the place where the boat sunk. The captain had given notice to those on board, that this deck was the place of safety, and advised all to get on it. Some fifty or sixty persons took refuge upon it, and were all saved; and there was room enough for twenty-five or thirty more. The persons on this deck were taken from it about daylight, by the steamboat General Harrison. The night was not dark, the sky being clear and the stars visible. There was some mist, or fog, near the surface of the lake; the wind was off shore, and nearly from the point S. S. W. There was but one yawl attached to the boat, which was sent ashore with thirteen or fourteen persons in her, who were all saved. Some of the passengers, and a part of the crew of the boat, prepared floats or rafts, made of doors, tables, etc., on which as the boat sunk, they launched into the lake; and, of those who betook themselves to those means of safety, a Mrs. Howk, and four others, viz., Messrs. Vandoren, Cone, Yerke, and Folsom, lost their lives.

The counsel for the defense, after the district attorney had closed his opening argument, declined addressing the jury, and moved the court to instruct them to the following effect: (1) As all crime consists in intention, the defendants are not guilty, unless they knowingly and willfully neglected their duty. (2) As the law does not require infallibility, the defendants are not responsible for errors in judgment, in the performance of their duties. (3) That greater strictness in proof is required in criminal than in civil cases, and the defendants, in order to be holden liable, must be brought within the statute in every particular. (4) That if the loss of life was not the necessary consequence of the sinking of the boat, but resulted from imprudence in leaving the wreck contrary to the captain's advice, he can not be convicted. (5) That if the collision was occasioned by want of proper lights on the schooner, the defendants ought not to be convicted.

---

[2] [From 6 West. Law J. 255.]

LEAVITT, District Judge, charged the jury substantially as follows: Before I call the attention of the jury to the testimony, as it applies to the allegations of the indictment, it becomes my duty to notice the propositions submitted by the counsel for the defense, on which the instruction of the court is requested. The section of the act of congress on which this indictment is framed declares, that officers and others, employed on any steamboat, by whose "misconduct, negligence, or inattention, the life or lives of any person or persons on board," shall be destroyed, shall be deemed guilty of manslaughter. It is believed, this is the first prosecution which has been instituted under this law, and that no construction has been given to it, in reference to the points now presented, by any of the courts of the Union. It is a rule of universal application in the construction of statutes, that courts must be governed by the words used to express the intention of the legislature, when they are free from all uncertainty or ambiguity. And this rule leads the mind to the conclusion, that it was the design of the lawmaking power, in the adoption of the section under consideration, to create an offense, and annex a punishment to it, on principles variant from those which apply to crimes at common law, or to those generally created by statutory enactment. At common law, and usually in statutory crimes, the intention with which the act is done, charged as criminal, constitutes the element of the crime. But, in the section now brought to the notice of the court, the legislature seem studiously to have avoided the use of any terms, or words, making the intention of the party an ingredient of the offense. It is declared, in words so plain as to admit of no doubt, that any act of "misconduct, negligence or inattention," on the part of any one concerned in steamboat navigation, producing as a result, the loss of life, shall incur the guilt and the penalty of the crime of manslaughter. If it had been intended that these consequences should follow, in cases only where there was evidence of a positive, malicious intent, the words used would doubtless have been such as to have made that intention clear. And, in that case, the offense defined and punished by the statute, would have been the same as manslaughter, as recognized at common law, and the statutes of all the states of the Union. But, it is most obvious, from the language of this section, that congress intended to go beyond this, and to provide punishment for acts to which the common law did not affix guilt or annex a penalty. I am, therefore, led to the conclusion, that it will be the duty of the jury, if satisfied the material allegations of the indictment are sustained by the evidence, to return a verdict of guilty. There can be no doubt, that it was the intention of congress to create an offense by this statute, the essence of which consists in "misconduct, negligence, or inattention" in such degree, and of such character, as to have resulted in the loss of human life. This is a subject matter, clearly within the jurisdiction of congress; and having provided, that certain acts of delinquency, attended with a certain result, shall subject the party to a penalty, irrespective of motive or intention, there is no reason why, in a proper case, the law should not be enforced. [It is no uncommon or extraordinary exercise of power for a legislature to provide, in cases where the interests of the public demand it, that acts involving no moral turpitude in the abstract should be visited with a penalty].[3] If it were true, as insisted by the counsel for the defense, that this view of the law gives to it a character of harshness and severity, which must render it odious to the community, and a reproach to a humane government, it would afford no reason why courts and juries should refuse to carry it into effect. Until repealed by the power which enacted it, it must have the force of law. But the statute under consideration is not liable to this objection. It is true, it declares, that certain facts being established, the parties implicated shall be deemed guilty of manslaughter; but it vests in the courts an ample discretion in regard to the punishment to be inflicted, which, properly exercised, will effectually guard against undue severity. The penalty consequent on a conviction may be imprisonment for ten years; but if the circumstances are such as to call on the court for lenity, the punishment may be merely nominal—not extending beyond a few hours' or a few days' imprisonment. And it may be here remarked, that this great latitude of discretion, vested in the courts by the statute, by which it becomes their duty to graduate the punishment according to the facts of the case, even to the extent of making it merely nominal, is conclusive to prove, that congress, in this enactment, did not contemplate the commission of the crime of manslaughter in its heinousness and guilt, as defined by the common law. If such had been the view of that body, it would not have been left in the discretion of the court, in case of a conviction, to assess a merely nominal punishment. For, according to the common law sense of the crime of manslaughter, it is impossible to conceive of any case in which the exercise of such a discretion would be either justifiable or necessary to the extent contemplated by the statute.

It may not be improper here to remark, that the title of the act of congress, and the circumstances leading to its passage, are significant of the purposes of its enactment, and throw light upon its true construction. It is entitled, "An act to provide

---

[3] [From 6 West. Law J. 255.]

for the better security of the lives of passengers on board of vessels, propelled in whole or in part by steam." It is a matter of public notoriety, and constitutes a part of the history of the times, that within a short period anterior to the date of this statute, numerous steamboat disasters had occurred in our country, attended with a melancholy loss of human life, under circumstances justifying the conclusion that there was gross negligence, yet without the possibility of proving, either positively or inferentially, a malicious intent. Such was the fearful magnitude of the evil, that public feeling demanded such national legislation on the subject as would be effective in preventing the recurrence of those calamities. The stern legislative provision under consideration, was the result of this state of things. Its design was to enforce the greatest possible vigilance and caution on the part of those concerned in steamboat navigation. The utility of the law has been satisfactorily tested by its salutary results. It has greatly elevated the business of steamboat navigation, by introducing in all its departments, men of higher moral characters, and superior practical qualifications for their duties. As a consequence, the instances of reckless disregard of human life, and accidents resulting from improper hazards, are much less frequent, while the public confidence in the safety of steamboat traveling is greatly increased.

It will be for the jury to say, whether the result charged in the indictment, namely, the deaths of the individuals named, is justly imputable to the "misconduct, negligence, or inattention" of the defendants, or any of them. If the collision happened from the improper and unskillful navigation of the schooner, or any other cause, rendering it an unavoidable occurrence, the defendants are entitled to a verdict of acquittal, in so far as they are charged with misconduct or omission of duty in connection with the collision.

There are some other points presented in the instructions asked for, which will be noticed by the court in the consideration of the evidence, as applicable to the indictment. To this evidence, i propose very briefly to direct the attention of the jury.

It will be proper to remark here, that the case presents itself in two aspects; first, in reference to the allegations of misconduct and negligence, producing the collision; and, second, in reference to the allegations of misconduct and negligence, in not taking prompt measures for the safety of the passengers after the collision. The second and fifth counts are those principally relied on by the prosecution; and the views which I propose to present, will be confined to these.

The second count charges substantially, that the defendants, in their several capacities, were guilty of misconduct and neglect, in not keeping a proper lookout, and in not using the proper efforts to steer and navigate the boat, whereby she came in collision with the schooner John Porter, and the lives of the persons named were destroyed by drowning. As the testimony clearly shows, the captain and first mate were not on duty for some time before, and when the collision took place, they can not be held answerable for it; and, under the second count, the inquiries of the jury will be confined to the conduct of the second mate, who was then the officer on deck. Did the second mate, Demond, fail in his duty, in not keeping a proper lookout, as the officer on deck? Captains Kelsey, Shook, Perkins, and Stannard, experienced and skillful navigators on the Lakes, have been sworn as experts in this case. They concur in stating that the officer on deck is for the time being, the sailing-master, and charged with general supervision of the boat; that it is his duty to be on the lookout for lights, obstructions, etc.; to give orders, when necessary, to the wheelsman and to the engineer, and that in general his proper place is on the deck, though it is his duty to be in other parts of the boat, where his presence may be required; and these witnesses also state, that it is proper and usual for the mate, when leaving the deck, except it be for a very short period, to give notice to the wheelsman of his intention, and request him to keep a lookout during his absence. It is also stated, by all the experts except one, that it is the duty of the wheelsman, not only to steer, but to keep a lookout for lights, etc., and that his position for this purpose is the most favorable one on the boat. The witness Kirby, who was at the wheel, when the collision took place, says the defendant, Demond, was on deck very shortly before it happened, and had just left the wheel-house, as the boat struck the schooner. He saw Demond run to the bell and ring to stop the engine, and immediately after, the collision took place. There is no evidence that Demond gave any orders to the wheelsman; nor does it appear he saw the schooner, till at the very moment of the collision. The witness Seymour states, that he was at the wheelhouse for some time before the collision happened, that Demond was on the deck, walking back and forth, and, part of the time, sitting with witness in conversation with him. Witness retired to his berth, and had hardly got to his room, till he heard two bells in quick succession, one to stop the engine, and one to back off. He also says, that while on deck he saw no lights, but those of the lighthouse at Conneaut, and of the steamboat Constellation.

This is all the material testimony as to this point; and from this, the jury will decide whether Demond was guilty of negligence or omission in not having discovered the schooner in time to avoid the collision. The jury will also inquire, under the second count, whether Demond, as the sailing master of the

boat, failed in duty, in not giving proper orders to the wheelsman, as to the course and direction of the boat. And in this inquiry, it will be proper for the jury to bear in mind, that if the wheelsman was steering the boat correctly, no order was required from the sailing master, and he cannot, therefore, be in fault for not giving an order. It seems, from the testimony of all the experts, that the steamboat, at the time she struck the schooner, was in the track usually followed by boats, going up the lake, which at that place is about six miles off shore. Kirby, the wheelsman, says he saw the schooner's light flash up for a moment; saw the light over the left bow of the boat, about one mile distant, witness steering at the time W. S. W. He then put the boat one point further out into the lake—in a few minutes saw the schooner very near; put the helm hard a-port, and immediately the boat struck the schooner. Witness says, after he saw the light of the schooner, it disappeared, and he saw it no more—supposed it was hid by the sails. Capt. Thomas, the master of the schooner, states, that he first saw the steamer's lights six or seven miles ahead, he steering at that time N. E. by E. He then put his vessel one point further out into the lake, and kept her steadily on that course. This witness says, it is the usage for sailing vessels, descending the lake at that point, to keep in shore from the steamboat track; but he thought he was rather too near the land, and therefore gave the order to put the schooner further out. He also testifies that there was a light at the end of the jib of the schooner, and also that just before the collision, he took the light out of the binnacle, held it up and hailed the steamboat. Although several witnesses state there was no light on the schooner at the time the collision happened, the weight of evidence proves there was a light.

In coming to a conclusion as to who was in fault in this collision, it will be important for the jury to attend specially to the testimony concerning the relative position and course of the schooner and the steamboat just before and at the time they came together. For, if, as before stated, the accident occurred through the improper navigation, and wrong course of the schooner, the sailing master of the steamer can not be held accountable. The captains already named, testifying as experts, agree in the opinion, that the schooner steering N. E. by E., and the steamer W. S. W., being six miles apart, the schooner must have been considerably in shore from the line of the steamer's course, and that it was the duty of the schooner to have kept inside of that line, hugging the shore. And these witnesses say, if she had pursued that course, a collision would have been impossible, without a change of the steamer's direction. Kirby says, he first saw the schooner's light over the left bow of the steamer, and if so, the schooner was then in shore from the

line of the steamer's direction. It is proved by the experts, to be the general usage in the navigation of the lakes, that when a sailing vessel and a steamboat are approaching in opposite directions, it is the duty of the former to pursue her course steadily; and, if necessary, the steamboat is expected to diverge from her previous direction. Capt. Shook, and perhaps some of the other professional navigators, say, Kirby, the wheelsman of the Chesapeake, was right, under the circumstances, in first putting the boat one point out into the lake, and when very near the schooner, putting the helm hard a-port, the effect of which was to give her a still more northerly direction.

If the jury, upon full consideration of the evidence, shall come to the conclusion that the schooner, through mistake, or unskillfulness of her sailing master, was proceeding across the line of the steamer's proper course, and that therefore the collision was unavoidable, the defendant, Demond, can not be held responsible for the consequences. Upon this supposition, there is no ground for the conclusion, that the accident was the result of neglect, or inattention on his part. If, however, the jury are satisfied, the collision is attributable to his delinquency in duty, in not keeping a vigilant lookout, and in not properly navigating the boat, as charged in the second count, it will then be their duty to inquire further, whether, as the result of the collision, the lives of the individuals named in the indictment were lost by drowning. There is no room to doubt, from the evidence, that the lives of those persons were destroyed by drowning. But, it is insisted, and the court is requested so to instruct the jury, that if the loss of their lives was not a necessary result of the collision, the allegation in the indictment, as to the means by which they came to their deaths, is not sustained, and, consequently, that there can not be a verdict of guilty on this count, or, indeed, any of the counts in the indictment.

The evidence is not satisfactory to prove, that any lives were lost, except those of persons, who left the boat, on floats or rafts. And it is proved, beyond all doubt, that the captain, and probably some other officers of the Chesapeake, notified the passengers that they would be safe by getting on the hurricane deck; and it is also clearly proved, that all who sought this place of safety were preserved. Whether the persons who unfortunately resorted to other means to save themselves, were apprized of the security afforded by the hurricane deck, is not known. If, being made acquainted with the fact, or if, by reasonable vigilance, they could have acquired this information, the persons whose lives were destroyed, under the influence of excessive alarm, unnecessarily and indiscreetly left the boat, preferring to run the hazard of launching into the lake, on floats or rafts, and as a consequence, were drowned, the destruction of

their lives is not so connected with, and a necessary result of the steamboat disaster, as to make the defendants answerable for their loss. On the other hand, if these persons, under the pressure of the circumstances in which they were placed, conducted with ordinary prudence and discretion, then the allegation in the indictment, as to the means by which they came to their deaths, is sustained.

The court will now call the attention of the jury to the fifth, or last count of the indictment. This count charges the defendant with a failure in duty, after the collision, in the following particulars: (1) In not causing an immediate examination to ascertain the nature and extent of the injury to the boat. (2) In neglecting to close the ash-holes. (3) In neglecting to run the boat ashore at the nearest and most convenient point, without delay.

I will not detain the jury by a re-statement of the evidence of each witness on these points; but will present a summary of the material facts proved, in relation to each of them. First, as to the allegation of improper delay in the examination of the injury to the boat. The degree of promptitude required of the officers of the boat, in making this examination, must depend in some degree on the character of the shock produced by the collision. If it was severe, and of a nature which should have induced the apprehension in the mind of an experienced and skillful navigator that the boat was seriously injured, the officers should be held to greater promptitude and vigilance in the examination of the injury, than under the opposite state of facts. It appears, that to some of the witnesses, the shock from the collision seemed slight, and produced no apprehension of serious injury to the boat; while others thought it severe, and such as necessarily to jeopard the safety of the persons on board. The defendant, Capt. Warner, had retired to his room for the night, but was roused by the shock of the collision; and some of the witnesses say, they saw him very soon after the collision, leaving his room without coat, hat or boots, and going to the forward part of the boat. These witnesses state, that no more time elapsed between the shock of the collision and the appearance of Capt. Warner on the deck, than was necessary to enable him partially to dress himself. The witness, Lytle, states, that he had not gone to his berth when the collision took place, but was near the saloon below the promenade deck. He was alarmed by hearing the engineer's bell ring in a very quick and hurried manner; and immediately the collision occurred; the schooner and the boat stuck together for a very short time, when the boat backed off, and they separated. This witness immediately lowered a light over the bow of the boat, and discovered a hole, in the left side of the bow, through which the water was coming in. He went at once on deck, where he met the captain, and

reported to him the result of his examination. The captain then ordered the second mate to make a thorough examination, and very soon the order was given to put the boat ashore. The witnesses, Hubbard, Kimball, and Dwight, agree in stating there was an examination, but can not state the precise time which elapsed from the collision till the examination was made. The last named witness says, he does not know that the captain could have done more than he did do. The witness, Howk, thinks about twelve minutes passed from the time of the collision, till it was discovered the boat was leaking.

As to the averment of neglect, in not stopping the ash-hole, the jury will have no difficulty in the conclusion that it is not sustained. This hole, it would seem, opens on the outside of the boat about six inches below the timbers of the main deck. Capt. Shook and others testify, that when the boat had so far sunk as to take in water at this hole, it would be impossible to prevent her from going down, and that the only effect of closing it, would be to retard the sinking for a short time.

I now call the attention of the jury to the third specification of the fifth count, namely, neglect in not running the boat ashore at the nearest and most convenient point without delay. It was clearly the duty of the captain, as the best mode of securing the lives of the passengers, as soon as it was ascertained there was danger the boat would go down, to run her ashore, with as little delay as circumstances would allow. In the adoption of this course, the law will hold him to reasonable promptitude. And if, from indecision or gross neglect of duty, he omitted to give the proper order in time, and as a consequence, the lives of passengers were lost, he is responsible for that result. It is therefore an important inquiry, whether there was unreasonable delay in giving the order to run ashore. There is some variation in the statements of the witnesses, as to the time that elapsed between the collision and the giving of this order. Howk says, this time was between twenty-five and thirty minutes; Kimball thinks, that about twenty minutes after the boat struck, he heard the captain say, he was about to run the boat ashore; Dwight says, that in about fifteen minutes after the collision, the boat was under headway for the land; Hubbard thinks, from twenty to thirty minutes elapsed; Stern states the time at from ten to fifteen minutes; Mrs. Bradbury thinks it was twenty minutes; Church says, he was on deck within fifteen minutes after the boat struck, and she was headed for shore; Mr. McIlvane says it was twenty minutes after the collision, before he heard there was a leak; Seymour gives it as his opinion, the time did not exceed eight or nine minutes; and Lytle says, the schooner sunk in ten minutes after

the collision, and that the boat started for shore immediately after. Capt. Thomas says, the schooner went down in ten minutes, and he supposes the boat started for shore as soon as it could be done. It is in evidence that after the discovery of the leak, an attempt was made to stop it, by forcing mattrasses and bed clothing into the hole, from the inside of the boat, and also to check the inflow of water by passing a sail over the bow; but both attempts were unsuccessful. It also appears, that strenuous efforts were made to keep the boat afloat, by putting the pumps to work, and by bailing, but without avail. And it is also proved that after the order was given to head the boat for the shore, every possible effort was made to increase her speed, by making all the steam that could be made, and that the firemen and engineers remained at their posts, doing their duty, till the fires were put out by the water, and the engine stopped.

There seems to be no doubt, from the opinion of the experts, that the captain was right in directing the boat for the pier at Conneaut, although that was not the nearest point of land in a direct line from the boat. The experts also concur in the opinion that the defendant, Warner, was in the strict line of his duty, as a humane seaman, in providing for the safety of the crew of the sinking schooner, by transferring them to his boat. And, in so far as any delay occurred from his attention to this duty, he is not liable to censure. Upon the whole, the jury will judge, taking all the circumstances into view, whether Capt. Warner conducted with reasonable promptitude in giving the order to run the boat ashore.

Without any further comments on the evidence, the case is now committed to the jury. If satisfied, from the proof, the defendants are guilty of "negligence, misconduct, or inattention," and that human life has been lost thereby, it will be the duty of the jury to return a verdict of guilty. And here it may be proper to remark, that it is not claimed—nor does the evidence afford the slightest ground for such an assumption—that the defendants, or any of them, were actuated by any malicious purpose, as connected with this unfortunate disaster. And, in some respects, it is clearly proved, they were active and prompt in attending to their duties after the collision took place, and that their conduct was highly meritorious. It is also proper that I should remark, that the defendants are entitled to the full benefit of the evidence which they have adduced, proving their general good professional characters. And in reference to allegations of negligence or misconduct, concerning which the jury may be in doubt as to weight of the testimony, the fair professional reputations of the defendants, may properly have such weight as to turn the scale in their favor.

Verdict of acquittal.