## Supreme Judicial Court.

### MASSACHUSETTS, NOVEMBER TERM, 1809.

Commonwealth
v.   }  MURDER.
Samuel Thompson.*

If one assuming the character of a physician, through ignorance administer medicine to his patient with an honest intention, and expectation of a cure, but which causes the death of the patient, he is not guilty of felonious homicide.

At the beginning of the term, the prisoner, *Thompson,* was indicted for the wilful murder of *Ezra Lovett,* jun. by giving him a poison called *Lobelia* on the 9th day of January last, of which he died on the next day.—On the 20th day of December, at an adjournment of this term,

---

* The reporter not being present at this trial, was favored with a report of it by a highly respected friend.

the prisoner was tried for this offence, before the *chief justice*, and the judges *Sewall* and *Parker*.

On the trial it appeared in evidence, that the prisoner, some time in the preceding December, came into *Beverly*, where the deceased then lived, announced himself as a physician, and professed an ability to cure all fevers, whether black, grey, green or yellow : declaring that the country was much imposed upon by physicians, who were all wrong, if he was right. He possessed several drugs which he used as medicines, and to which he gave singular names. One he called *coffee ;* another *well-my-gristle ;* and a third *ram-cats.* He had several patients in *Beverly* and in Salem, previous to Monday, the 2d of January, when the deceased, having been for several days confined to his house by a cold, requested that the prisoner might be sent for as a physician.

He accordingly came, and ordered a large fire to be kindled to heat the room. He then placed the feet of the deceased, with his shoes off, on a stove of hot coals, and wrapped him in a thick blanket, covering his head. In this situation he gave him a powder in water, which immediately puked him. Three minutes after, he repeated the dose, which in about two minutes operated violently. He again repeated the dose, which in a short time operated with more violence. These doses were all given within the space of half an hour, the patient in the mean time drinking copiously of a warm decoction, called by the prisoner his *coffee.* The deceased, after puking, in which he brought up phlegm, but no food, was ordered to a warm bed, where he lay in a profuse sweat all night. Tuesday morning the deceased left his bed, and appeared to be comfortable, complaining only of debility : and in the afternoon he was visited by the pri-

soner, who administered two more of his emetic pow-
ders in succession, which puked the deceased, who du-
ring the operation, drank of the prisoner's *coffee*, and
complained of much distress.   On Wednesday morning
the prisoner came, and after causing the face and hands
of the deceased to be washed with rum, ordered him to
walk in the air, which he did for about fifteen minutes.
In the afternoon the prisoner gave him two more of his
emetic powders, with draughts of his *coffee*.   On Thurs-
day the deceased appeared to be comfortable, but com-
plained of great debility.   In the afternoon the prisoner
caused him to be again sweated, by placing him, with
another patient, over an iron pan with vinegar heated
by hot stones put into the vinegar, covering them at the
same time with blankets.   On Friday and Saturday the
prisoner did not visit the deceased, who appeared to be
comfortable, although complaining of increased debility.
On Sunday morning, the debility increasing, the prisoner
was sent for, and came in the afternoon, when he admi-
nistered another of his emetic powders with his *coffee*,
which puked the deceased, causing him much distress.
On Monday he appeared comfortable, but with increas-
ing weakness, until the evening ; when the prisoner
visited him, and administered another of his emetic pow-
ders, and in about twenty minutes repeated the dose.
This last dose did not operate.   The prisoner then ad-
ministered pearl-ash mixed with water, and afterwards
repeated his emetic potions.   The deceased appeared
to be in great distress, and said he was dying.   The pri-
soner then asked him how far the medicine had got down.
The deceased, laying his hand on his breast, answered,
*here* : on which the prisoner observed that the medicine
would soon get down, and unscrew his navel : meaning,

as was supposed by the hearers, that it would operate as a cathartic. Between nine and ten o'clock in the evening, the deceased lost his reason, and was seized with convulsion fits ; two men being required to hold him in bed. After he was thus seized with convulsions, the prisoner got down his throat one or two doses more of his emetic powders ; and remarked to the father of the deceased, that his son had got the *hyps* like the devil, but that his medicines would fetch him down ; meaning, as the witness understood, would compose him. The next morning the regular physicians of the town were sent for, but the patient was so completely exhausted, · that no relief could be given. The convulsions and the loss of reason continued, with some intervals, until Tuesday evening, when the deceased expired.

MASSACHU-
SETTS,
1809.

Com'wealth
v.
Thompson.

From the evidence it appeared that the *coffee* administered was a decoction of *marsh-rosemary*, mixed with the bark of *bayberry bush*, which was not supposed to have injured the deceased. But the powder which the prisoner said he chiefly relied upon in his practice, and which was the emetic so often administered by him to the deceased, was the pulverized plant, trivially called *Indian tobacco*. A Dr. *French*, of *Salisbury*, testified that this plant, with this name, was well known in his part of the country, where it was indigenous, for its emetic qualities ; and that it was gathered and preserved by some families, to be used as an emetic, for which the roots, as well as the stalks and leaves, were administered ; and that four grains of the powder was a powerful puke. But a more minute description of this plant was given by the Rev. Dr. *Cutler*. He testified that it was the *lobelia inflata* of Linnaeus* : that many years

---

* Lobelia. Class Pentandria. Order Monogynia. Capsule 2 or 3 celled : corol irregular, cloven : antherae united : stigma sim-

ago, on a botanical ramble, he discovered it growing in a field not far from his house in *Hamilton* : that, not having *Linnaeus* then in his possession, he supposed it to be a non-descript species of the *lobelia* : that by chewing a leaf of it, he was puked two or three times : that he afterwards repeated the experiment with the same effect: that he inquired of his neighbour, on whose ground the plant was found, for its trivial name.   He did not know of any ; but was apprized of its emetic quality, and informed the doctor that the chewing of one of the capsules operated as an emetic, and that the chewing more would prove cathartic.   In a paper soon after communicated by the doctor to the American Academy, he mentioned the plant, with the name of the *lobelia medica*. He did not know of its being applied to any medical use until the last September, when being severely afflicted with the asthma, doctor *Drury*, of *Marblehead*, informed him that a tincture of it had been found beneficial in asthmatic complaints.   Dr. C. then made for himself a tincture, by filling a common porter bottle with the plant, pouring upon it as much spirit as the bottle would hold, and keeping the bottle in a sand heat for three or four days.   Of this tincture he took a table-spoon ful, which produced no nausea, and had a slight pungent taste.   In ten minutes after he repeated the potion, which produced some nausea, and appeared to stimulate the whole internal surface of the stomach.   In ten minutes he again repeated the potion, which puked him two or three times, and excited in his extremities a strong sensation like irritation : but he was relieved from a parox-

ple.   Species.   Inflata: stem erect: leaves ovate, slightly serrate, longer than the peduncle : capsutes inflated.

                    *Turt. Lin. vol. 4, pp.* 259. 330.

ysm of the asthma, which had not since returned. He
had since mentioned this tincture to some physicians,
and has understood from them that some patients have
been violently puked by a tea-spoonful of it: but whe-
ther this difference of effect arose from the state of the
patients, or from the manner of preparing the tincture,
he did not know.

*The solicitor general* also stated, that before the de-
ceased had applied to the prisoner, the latter had ad-
ministered the like medicines with those given to the
deceased to several of his patients, who had died un-
der his hands; and to prove this statement he called
several witnesses, of whom but one appeared. He, on
the contrary, testified that he had been the prisoner's
patient for an oppression at his stomach—that he took
his emetic powders several times in three or four days,
and was relieved from his complaint, which had not
since returned. And there was no evidence in the
cause that the prisoner, in the course of his very novel
practice, had experienced any fatal accident among his
patients.

The defence stated by the prisoner's counsel was,
that he had for several years, and in different places,
pursued his practice with much success; and that the
death of the deceased was unexpected, and could not
be imputed to him as a crime. But as the court were
satisfied that the evidence produced on the part of the
commonwealth did not support the indictment, the pri-
soner was not put on his defence.

*The chief justice* charged the jury: and the substance
of his direction, and of several observations which fell
from the court during the trial, are for greater conve-
nience here thrown together.

MASSACHU-
SETTS,
1809.

Com'wealth
v.
Thompson.

As the testimony of the witnesses was not contradict-
ed, nor their credit impeached, that testimony might be
considered as containing the necessary facts, on which
the issue must be found.

That the deceased lost his life by the unskilful treat-
ment of the prisoner did not seem to admit of any rea-
sonable doubt : but of this point the jury were to judge.
Before the Monday evening preceding the death of *Lo-
vett*, he had, by profuse sweats, and by often repeated
doses of the emetic powder, been reduced very low.
In this state, on that evening, other doses of this *Indian
tobacco* were administered.    When the second potion
did not operate, probably because the tone of his sto-
mach was destroyed, the repetition of them, that they
might operate as a cathartic, was followed by convul-
sion fits, loss of reason, and death.

But whether this treatment, by which the deceased
lost his life, is or is not a felonious homicide, was the
great question before the jury.

To constitute the crime of murder, with which the
prisoner is charged, the killing must have been with ma-
lice, either express or implied.    There was no evidence
to induce a belief that the prisoner, by this treatment, in-
tended to kill or to injure the deceased ; and the ground
of express malice must fail.    It has been said, that im-
plied malice may be inferred from the rash and presump-
tuous conduct of the prisoner, in administering such
violent medicines.    Before implied malice can be infer-
red, the jury must be satisfied that the prisoner, by his
treatment of his patient, was wilfully regardless of his
social duty, being determined on mischief.    But there
is no part of the evidence which proves that the priso-
ner intended by his practice any harm to the deceased

On the contrary, it appears that his intention was to cure him. The jury would consider whether the charge of murder was, on these principles, satisfactorily supported.

But though innocent of the crime of murder, the prisoner may, on this indictment, be convicted of manslaughter, if the evidence be sufficient. And the *solicitor general* strongly urged, that the prisoner was guilty of manslaughter, because he rashly and presumptuously administered to the deceased a deleterious medicine, which in his hands, by reason of his gross ignorance, became a deadly poison.

The prisoner's ignorance is in this case very apparent. On any other ground, consistent with his innocence, it is not easy to conceive, that on the Monday evening before the death, when the second dose of his very powerful emetic had failed to operate, through the extreme weakness of the deceased, he could expect a repetition of these fatal poisons would prove a cathartic, and relieve the patient : or that he could mistake convulsion fits, symptomatic of approaching death, for an hypochondriac affection.

But on considering this point, the court were all of opinion, notwithstanding this ignorance, that if the prisoner acted with an honest intention and expectation of curing the deceased by this treatment, although death, unexpected by him, was the consequence, he was not guilty of manslaughter.

To constitute manslaughter, the killing must have been a consequence of some unlawful act. Now there is no law which prohibits any man from prescribing for a sick person with his consent, if he honestly intends to cure him by his prescription. And it is not felony, if

MASSACHU-
SETTS,
1809.

Com'wealth
v.
Thompson.

MASSACHU-
SETTS,
1809.

Com'wealth
v.
Thompson.

through his ignorance of the quality of the medicine prescribed, or of the nature of the disease, or of both, the patient, contrary to his expectation, should die. The death of a man, killed by voluntarily following a medical prescription, cannot be adjudged felony in the party prescribing, unless he, however ignorant of medical science in general, had so much knowledge, or probable information of the fatal tendency of the prescription, that it may be reasonably presumed by the jury, to be the effect of obstinate wilful rashness at the least, and not of an honest intention and expectation to cure.

In the present case there is no evidence that the prisoner, either from his own experience, or from the information of others, had any knowledge of the fatal effects of the *Indian tobacco*, when injudiciously administered : but the only testimony produced to this point, proved that the patient found a cure from the medicine.

The law thus stated, was conformable, not only to the general principles which governed in charges of felonious homicide, but also to the opinion of the learned and excellent lord chief justice *Hale*. He expressly states (1 H. P. c. 429.) that if a physician, whether licensed or not, gives a person a potion, without any intent of doing him any bodily hurt, but with intent to cure, or prevent a disease, and contrary to the expectation of the physician, it kills him, he is not guilty of murder or manslaughter.

If in this case it had appeared in evidence, as was stated by the *solicitor general*, that the prisoner had previously, by administering this *Indian tobacco*, experienced its injurious effects, in the death or bodily hurt of his patients, and that he afterwards administered it in the same form to the deceased, and he was killed by

it, the court would have left it to the serious considera-
tion of the jury, whether they would presume that the
prisoner administered it from an honest intention to
cure, or from obstinate rashness and fool-hardy pre-
sumption, although he might not have intended any bo-
dily harm to his patient. If the jury should have been
of this latter opinion, it would have been reasonable
to convict the prisoner of manslaughter at least. For
it would not have been lawful for him again to admi-
nister a medicine of which he had such fatal expe-
rience.

It is to be exceedingly lamented, that people are so
easily persuaded to put confidence in these itinerant
quacks, and to trust their lives to strangers without
knowledge or experience. If this astonishing infatua-
tion should continue, and men are found to yield to the
impudent pretensions of ignorant empiricism, there
seems to be no adequate remedy by a criminal prosecu-
tion, without the interference of the legislature ; if the
quack, however weak and presumptuous, should pre-
scribe, with honest intentions and expectations of re-
lieving his patients.

*The prisoner was acquitted.*

*Bartlet* and *Story*, for the prisoner.