## Case No. 16,441.

### UNITED STATES v. TAYLOR.

[5 McLean, 242; [1] 8 West Law J. 481.]

Circuit Court, D. Ohio. April Term, 1851.

STEAM VESSELS — EXPLOSION — CRIMINAL RESPONSIBILITY OF OFFICERS.

1. Any officer of a steamboat through whose negligence or ignorance, an explosion takes

[1] [Reported by Hon. John McLean, Circuit Justice.]

place which is destructive of life, is guilty of manslaughter.

2. An officer assuming to act as engineer, is presumed to be well acquainted with the duties he assumes to discharge, and ignorance is no excuse.

3. In such cases the strictest attention, and a perfect knowledge of the business, are necessary to the discharge of the duty.

4. A steam agency is attended with dangers.

This is an indictment which charges the defendant [John B. Taylor] with negligence, as an engineer on board of the Virginia, a steamboat plying between Steubenville in Ohio and Wheeling in Virginia, through which an individual by the name of Rose, and other persons whose names are unknown, were killed by the explosion of the steamboat boiler.

A jury being sworn, Mr. Bowls was called as a witness by the prosecution, who stated, that for twenty years he had been employed on steamboats. He was first cabin-boy, then steward, cook, second mate; acted as pilot two years. The Virginia was finished the 2d May, 1848. He had charge of the boat on the day of the explosion, the — March, 1849. The boat started from Steubenville, her downward trip, stopped first at Wellsville, where some passengers were put out, and freight. Then proceeded down the river, next place at Warren, then Wheeling. On the return trip, stopped at the gas works, took in a passenger at the ship yard, a carpenter; had a flat boat in tow from Wheeling. Stopped at Litton's Landing on the Ohio side; not certain whether the boat was made fast; some passengers and freight were discharged there; did not remain more than five minutes. About the time the boat was ready to start, rang the alarm bell for the engineer to ship the engine, that is, to get ready. This the last witness recollects. A dead sound or crash followed, but he was not conscious. After he became conscious he looked for his wife; found a woman in the water, wounded; tried to lift her out, but was not able. He saw on the wreck a man and his wife, wounded. Saw the clerk of the boat in the water, from which he was rescued. The boat remained at the landing five minutes; no steam was let off. Does not recollect whether the steam was high; the engine was not worked at the landing. About an hour before the explosion, saw the engineer sitting near the engine. Witness said to him, we are getting up the river faster than usual, but does not recollect what reply was made. The engineer still continued reading. Witness does not know that there was a supply of water in the boiler. He thinks there was more weight on the safety valve than usual. The explosion took place about five o'clock in the evening. When the boat lands, the steam should be worked off, or be permitted to escape. The weights on the safety valve were not usually hung there.

William Burke was acquainted with the machinery. Witness built small engines. He has acted as engineer. Made two or three

trips on the Virginia. The last trip he made on her was about a month before the explosion. The boilers were said to be new, and they had that appearance. And the engine seemed to be in good condition. Six weeks or two months before the explosion, witness thought the boilers were number one; bore one hundred and twenty-seven pounds to a square inch. This without the extra weight. Want of water in the boiler produces explosion. It is the business of the engineer to see that there is a sufficiency of water in the boiler.

Mr. Litton stated the explosion took place at his wharf. He was in his warehouse when it took place. Four or five persons were taken out of the river. Three dead bodies were recovered from the river.

Mr. McCully says the cause of the explosion was a want of water in the boiler.

On the part of the defendant, the following witnesses were examined:

Capt. Dormon: Says for the last three years he has been running a boat as captain, between Wheeling and Steubenville. Was a passenger on board the Virginia. He handled the pump as other men. The ice was running—defendant was engineer, and did well. Witness has been steamboating thirty-five years.

Capt. Wosley: Was captain on the boat; defendant engaged as engineer eighteen months or two years. He considered the defendant a careful man.

Mr. Fox: Has been an engineer ten years; has known defendant six years as an engineer, and he considers him a careful man. Some of the pieces of the boiler which witness examined, appeared to have been defective.

The District Attorney of the United States for Ohio.

Before McLEAN, Circuit Justice.

In their instructions to the jury, THE COURT said: This prosecution is brought under the 12th section of the act of 7th July, 1838 [5 Stat. 306], which provides "that any captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, or negligence, or. inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court in the United States, shall be sentenced to confinement at hard labor for a period not more than ten years."

The numerous disasters which have occurred to steamboats on our lakes and rivers, destructive to the lives of passengers, became so frequent, as to call for legislation by congress, in whom is vested the commercial power in regard to our commerce with foreign nations, and among the several states. Many of these occurrences were believed to happen through the ignorance or want of attention of the officers on board the vessel. And the above act was passed to punish any misconduct, negligence, or inattention of the officers on board of any steamboat or other boat propelled by steam, through which life was destroyed.

The first thing to be observed in regard to this law is, that every one who assumes to perform certain duties, as captain, pilot, or other responsible duty on board a steamboat, is made responsible for any act done, through ignorance or negligence, without reference to his fitness for such duty. This is proper. Any individual who is incompetent to discharge the duties of engineer, is guilty, though the act which destroys life was done through ignorance. It is no mitigation of the offense that the engineer erred through a want of knowledge. He should not have engaged in a duty so perilous as that of an engineer, when he was conscious that he was incompetent. The explosion which took place in the case before us was perhaps, more destructive of life than any other which has occurred, when the small number of passengers on board the Virginia is compared to other explosions. The question you are to try is, Did it occur through the ignorance or carelessness of the engineer? No other person on board the boat is implicated. From the evidence it appears that there was an unusual pressure of steam, on ascending the river from Wheeling. Weights were hung on the safety valve. This was unusual. One of the witnesses being near the engine, saw the engineer sitting in a chair, reading. He observed to him that the boat was running more rapidly than usual. No reply was made. On the trip up the river, stopped frequently. About one hundred and fifty yards below the place of explosion, the boat rounded to the shore, where it remained about five minutes; the steam was not worked off at that place, nor was it permitted to escape. At Litton's wharf, the boat remained about five minutes; no steam was let off. The boat, on landing, it is said, by one of the witnesses, ran on the ground, which caused her to careen, the side of the boat aground being higher than the other side. This necessarily threw the water in the boilers to the lower side. The fires were continued, no steam escaped, and when the wheel made a few strokes of backwater, which drew the boat from the ground, it assumed a level position, and the explosion instantly took place. Several of the witnesses said the explosion occurred because there was not a sufficient quantity of water in the boilers. When the boilers have their full complement of water, a boiler very rarely, it is supposed, bursts. But when there is a deficiency of water, and the vessel is careened, the upper side of the boiler must soon become heated to the utmost extent, and when water is suddenly thrown against the red heat of the boiler, as it must be, when the vessel is afloat, there is great dan-

ger of an explosion, as the water, in coming in contact with the red heat of the boiler, is immediately converted into gas, and an explosion generally follows.

Now, gentlemen, it is for you to say, whether the engineer was not bound to ascertain the quantity of water in the boilers; and, especially, whether it was not his duty to let off the steam, whenever the boat lands or stops, and especially, when the steam is high. If, in this respect, or in any other, the engineer was guilty of negligence, your verdict will be, guilty. It is true, the punishment of the engineer, if guilty, will not restore the dead, or mitigate the sufferings of the wounded. But the example will be salutary to prevent like occurrences in future. This is one of the great objects of punishment. I am disposed to think that very few persons consider the dangers of steamboat travelling. Every passenger sleeps and treads upon a fiery volcano, governed by the fixed laws of the most dangerous and powerful agent in nature. And if he, under whose superintendence this fiery agent shall be placed, is ignorant of its laws, or does not strictly attend to them, an explosion is certain, and a destruction of life more than probable. Custom often familiarises us with dangers, until they are but little regarded. But when the agent is charged and restrained beyond the point of endurance, its bonds are broken, and destruction follows. It is your province, gentlemen of the jury, to weigh the evidence, and decide on the probabilities of guilt. Guilt in such cases as this, is seldom susceptible of clear demonstration. We have to act on the highest degree of moral certainty. If you are satisfied, in such a view, of the guilt of the defendant, you will so find; but if your minds are not led to this result, you will find the defendant not guilty.

After being out a considerable time, the jury returned a verdict of not guilty.

[NOTE. The report of this case as published in 8 West. Law J. 481, is somewhat different in form and in some respects is more complete. It is as follows:]

This was a prosecution under the act of July 7, 1838, against the defendant as engineer of the steamboat Virginia, which burst her boilers on the Ohio river, between Steubenville and Wheeling, at Litton's Landing, on the 30th of March, 1849. This act provides: "Sec. 12. That every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person or persons on board of said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court of the United States, shall be sentenced to confinement, at hard labor, for a period of not more than ten years." The indictment consisted of three counts. The first charged the defendant with misconduct, negligence, and inattention to his duties as engineer of the steamboat Virginia, navigating the Ohio river, in allowing the steam to accumulate in such excess as to burst the boiler of the boat, by reason of which bursting, and the is-

suing of steam and hot water therefrom, one A. B. was mortally wounded, bruised, burned, and scalded, by reason of which he died, concluding with the charge of manslaughter in usual form. The second count charges the bursting to have been caused by deficiency of water in the boiler, occasioned by the unlawful neglect and inattention of the defendant as engineer, whereby several persons unknown were wounded, bruised, and pushed into the water and drowned. The third count charges the bursting of the boiler to have been caused by the negligence and misconduct of the engineer, in creating and allowing to be created, an undue quantity of steam, and not permitting the same to escape, which occasioned the explosion and "destroyed the life of a person on board said vessel whose name is to the jurors unknown.

The prosecution was conducted by Samson Mason, Esq., U. S. Dist. Atty.

Baber & Nobel, for defendant.

The only witness, who was on board of the boat, called, was Robert Boals, pilot. He testified that the boat was placed under his command in Steubenville, on the morning of the 30th March, A. D. 1849, by the captain, William T. Dawson, who was to get off at Warren. The boat Virginia was a regular packet between Steubenville and Wheeling, on the Ohio. That he ran her down that day to Wheeling, leaving the captain at Warren. Stopped frequently on the route to land passengers and take in goods. The boat arrived at Wheeling about noon, the usual time. She left Wheeling, on her return trip, at a few minutes before two o'clock. She stopped twice in the immediate vicinity and towed a flatboat a short distance. She stopped about eight times between Wheeling and the place of explosion, about eleven and a half miles above. The last place, previous to the explosion, was at Rush Run, about one hundred and fifty or two hundred yards below Litton's Landing, where she laid about five minutes. He did not recollect to have heard steam let off here, or worked off through the engine: thinks he did not notify the engineer that they intended to stop again at Litton's; moved from Rush Run to Litton's; stopped here again about five minutes; rang the alarm bell to prepare to back, when the explosion occurred—all he recollects, except a dull heavy sound—until he came to, as he was coming down the bank. There were about thirty-five passengers and six or seven of the crew on board. Himself and wife were in pilot house; both hurt captain and son, clerk, and engineer, not killed; several passengers killed—the top works or cabin nearly all blown away—one boiler was torn to pieces and scattered on shore; the other had the heads blown off and a hole in one side; this was thrown into the river. The bodies which the witness saw were blackened, as was also the boat. They appeared as if covered with some black substance. The boat was run up to the landing at Litton's, where the road came down the bank to the water, the side of the road was composed of rocks. The landing is shallow in low water. The boat was narrow, with heavy upper works. She had two boilers, thirty-six inches in diameter, twenty-two feet long, with two internal flues each of about twelve or fourteen inches in diameter of one-fourth inch iron. He also stated that about an hour before the explosion, he left the wheel in the hands of a passenger and went below to engine-room for a drink, and found the defendant sitting on a chair between the engines with his face towards the boilers, reading a pamphlet. He remarked to the engineer that "they were skipping up the river a little faster than usual." He did not know how long he was reading. After the explosion, he found one of the engines shipped up to back. The boat was built with new boilers in May, 1848. The witness said "he did not know whether the boat careened" at Litton's Landing. It was also proved that the boat was

only about seventeen or eighteen feet wide, by about one hundred and five feet long, with heavy upper works—was seen by several witnesses to careen more than boats usually do. It was also proved that a wrench of about three pounds weight was attached to a rope running from the end of the lever of the safety valve, to hold it down. This lever was about thirty-two or thirty-four inches long from the fulcrum. The valve attached to the same lever, about four inches from the fulcrum, and about three and a half inches in diameter. The regular weight for the safety valve was one hundred and twenty-seven pounds to the square inch. It was also proved that the engineer had been employed in that capacity for seven or eight years; was capable and expert in discharging his duties; that he was extraordinarily careful, and sober. The modes in which explosions are supposed to take place by deficient supply of water, by excess of pressure, and the effect of careening in producing explosions, were explained by experts. It was stated that the usual rate of the packets on this route was about six miles an hour.

Mr. Mason urged that the case was an important one to both the public and to defendant. The testimony was to be derived from persons on board and they were usually all destroyed. These explosions are appalling on our western waters, yet nobody is to blame; this is wrong. This law is to fix the blame and to secure the public. The law is open as to punishment to the discretion of the court, and therefore the evidence required should not be of the strictest character. He then examined the facts, and the idea of the boat careening—denied there *was any proof or any probability of this.* Claimed the explosion to have occurred by too little supply of water. That it was the result of negligence, he considered established, sufficiently by the fact, that the boilers were new, the machinery good, no steam permitted to escape, and the boilers burst. It was mere accident that any positive evidence as to deficient supply of water could be obtained. He then dwelt upon the proof of the various modes of death alleged in the indictment.

Mr. R. P. L. Baber, made the following points for the defense:

(1) That there was no evidence under the first and third counts of the indictment, because the witnesses adduced by the prosecution as experts, had sworn expressly that no explosion could occur from the causes alleged in those counts. There was no positive proof under the second count, and the government had failed in proving the charge of manslaughter as laid in the indictment.

(2) In cases of this sort the rule of law laid down in 1 Greenleaf on Evidence (section 34) peculiarly applies, that "when a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoner's guilt, but inconsistent with any other rational conclusion:" indeed, "this presumption of innocence is so strong, that even where the guilt can be established only by proving a negative, that negative must be in most cases proved, by the party alleging the guilt, though the general rule of law devolves the burden of proof on the party · holding. the affirmative." Id. § 35, and cases there cited as to offenses created by statute. Therefore to convict the prisoner. the offense created by the law of congress being of a quasi negative character, the prosecution must show, that as engineer he was not diligent, was not attentive, and that his conduct was not proper.

(3) Some personal act of omission or misconduct in his duties must be proved against the prisoner. Rex v. Allen, 7 Car. & P. 153; Rex v. Green, Id. 156, 32 E. C. L. 549, 550. A person is not responsible for a mere error of judgment (see cases as to physicians.—Rex v. Van Butchell, 3 Car. & P. 629; Rex v. Williamson (Midwife's Case) Id. 635; 4 Car. & P.

398–407; Com. v. Thompson, 6 Mass. 134), but only for "the grossest ignorance and criminal inattention" (Lord Ellenborough, in 19 E. C. L. 444). But in these cases the rule is laid down differently as to civil responsibility, and their distinction of the common-law is recognized by the act of congress itself, which in the 13th section of the law makes the fact of explosion "full prima facie" evidence of negligence in all civil actions.

(4) Explosions may occur from too great pressure of steam, which at 212 deg., is equal to 15 lbs. per square inch, and at high temperature for every 30 deg. of heat, the pressure doubles itself, so that between 345 deg., the point of safety, and 468 deg., the point of bursting on our common western steamboilers, there is only 123 deg. See Dr. Locke's report on the explosion of the Moselle, commencing on page 154, of the Family Magazine of 1839. The report contains many valuable facts on the subject of steamboat explosions in which it is remarked that no error is more common among western engineers than that a boiler can not burst with plenty of water in it, and none is more fatal in its consequences; and the theory of gaseous explosions is denied. The point of safety in a boiler is calculated thus: multiply the thickness of the boiler in inches · into twice the number of pounds of pressure necessary to break a square inch of the material of which the boiler is composed, and divide the product by the number of inches in the diameter of the boiler, the quotient will be the number of pounds pressure to a square inch, that will burst the boiler, and one-fourth of that amount will be the limit of safety. The formula as laid down in Dr. Locke's report on the Moselle explosion is 2 P. multiplied by A. divided by D. is equal to B. Therefore S. is equal to B. divided by 4, and on the supposition that iron will bear a pressure of 60,000 lbs. per square inch, this rule in the case of the Virginia would give 2 multiplied by 60,000, multiplied by ¼, divided by 36 is equal to 888; therefore, point of safety, 222 lbs., and the evidence shows that at no time did the pressure on the boiler ever with the extra 3 lbs. weight, exceed 131 lbs. per square inch, much below the average pressure the worst iron would bear. The average given as the result of Prof. Jones & Johnson's experiments is 45,000 lbs. per square inch. See 7 Sen. Doc. (405) of 1842, 1843, page 51.

(5) There is no evidence to convict, yet if necessary, it can be shown from circumstances, that the explosion occurred from the careening of the boat. The testimony of Boals is to be received with caution, as he could not be expected to criminate his own conduct as pilot, yet he only says "he does not know whether the boat careened," and the evidence shows that he was negligent in performing his own duties. The landing is proved to have been very rough, and the boat of narrow beam and heavy upper works, and in the habit of lurching much, the larboard boiler burst first and was most shattered; and as to the effects of keeling, see Professor Johnson's remarks in Journal of Science, vol. 20, p. 309, where he shows every nine pounds of iron makes one pound of steam, and that the amount of pressure produced in a boiler 20 feet by 30 inches. would be 906 lbs. per square inch,—a point of inevitable explosion,—a fortiori the same result would follow sooner in the Virginia, if the boat was the least out of level as the boilers were much heavier. See, also, Ewbank in reports of Franklin Institute, vol. 9, p. 363.

(6) Again, the defective materials of a boiler, such as flawy iron, is a frequent cause of explosions (Journal of Science, vol. 35, p. 317; Prof. Renick, Id. vol. 20, p. 339; Prof. Sullivan, Id. vol. 19, p. 144), but not gas formations, as is asserted by one of the experts (see Dr. Locke's report on the Moselle explosion).

(7) The engineer is liable to be deceived by

the safety-valve on which no dependence can be placed (Journal Franklin Institute, vol. 7, p. 291; Journal of Science, vol. 19, p. 148), and also the gauge cocks (Ewbank in Franklin Institutes, vol. 9, p. 366), by blowing "hoarse" with foam (see Dr. Locke's report on the Moselle explosion). Hence, the government has directed a series of experiments for the better protection of steam boilers. 7 Sen. Doc. (405) of 1842, 1843, p. 3. The Virginia, when she blew up on the 30th November, 1849, had none of these improved protections invented by Evans, Bache, etc., or fusible plugs. Frank. Inst. p. 89. Therefore, if on any reasonable hypothesis, the explosion occurred from any of these causes, the prisoner must be acquitted according to the rule laid down by Greenleaf in weighing circumstantial evidence in criminal cases, or on the ground of doubt at least, especially as the testimony of all the witnesses concur in the fact that he was a very careful and sober man—never touching a drop of intoxicating liquor—certainly a good sign considering the general character of men in his exposed situation, as well as the fact of his being engaged in reading (instead of playing cards, like some river men) which the prosecution have wholly failed in proving an act of inattention.

By H. C. Noble, for defendant, it was urged:

(1) That the mere fact of explosion was not, as a presumption of law, prima facie evidence of guilty neglect. For in all criminal charges the guilty neglect, the gist of the crime, must be proved as alleged. This rule in England prevails in civil cases, and it is held there that such neglect must be proved beyond a doubt to be the cause of the accident. 11 E. C. L. 119, 120; 14 E. C. L. 497; 19 E. C. L. 198, 919; 24 E. C. L. 391. In the law under consideration, it is true that the rule has been changed (section 13) in civil cases, but the necessity of this clear proof in criminal cases is left unaltered. The proof therefore of neglect should be clear and positive; any doubt should be resolved in favor of defendant. 1 Greenl. Ev. pp. 40–42; Whart. Cr. Law, 190.

(2) Though there is no presumption at law that an explosion is prima facie evidence of neglect, this is the prevailing opinion in many minds. We think this wrong.

First. Because of the nature and energy of steam itself. Steam varies in pressure from 15 lbs. or one atmosphere to the square inch, to 8320 atmospheres or 124,800 lbs. to the square inch (36 Journal of Science, 242); and one boiler of the dimensions of the Virginia, with steam at 127 lbs. to the square inch—her gauge—would contain more than 3,000,000 lbs. of pressure on the outer cylinder alone.

Second. While steam is used in France and England at low pressure, not averaging in the English marine over 10 lbs. to the square inch, and in the eastern states at a pressure of from 16 lbs. to 40 or 50 lbs. to the square inch, the usual pressure in our western boilers is from 100 to 200 lbs. to the square inch. This is to some extent necessary on our shallow rivers, but it is carried to excess, is encouraged by our people and permitted by congress.

Third. The danger of explosions is increased by the imperfect control over steam by means of our ordinary machinery. Boilers are often defective in their iron, in their mode of construction, especially on account of internal flues, in the force pumps, gauge cocks, safety valves, and in the shape of the boat and arrangement of the boilers. And particularly in not having some accurate means of measuring their heat, as it is laid down by Dr. Locke, that the addition of 1123 lbs. of heat changes the state of steam from safety to certain explosion.

These are some of the defects and dangers inherent in steam navigation in the west, dangers and defects sanctioned by the public, unregulated by congress and entirely independent of the care, skill, or negligence of engineers.

Is it not, therefore, unjust to presume every explosion the result of carelessness or negligence without proof of the facts of such negligence or misconduct. We claim therefore that there being no positive and clear evidence of neglect in this case, and no presumption at law or fact arising from the explosion alone, the defendant should be acquitted. But it may be asked, how do we explain this explosion? How do we suppose it took place? without admitting that we are required to explain it or in any way to exculpate our client, or without referring you to the many causes above enumerated as capable and likely to produce this explosion, we think the explosion can be clearly explained by the careening of the boat at the shore where it landed, the consequent changing of the water from one boiler to the other, the heating the boiler or flues thus left bare and the return of water and sudden creation or "flashing up" of steam in so large a quantity as to burst the boilers. This is our explanation, and now let us look for a moment at the facts of the case, and see how they sustain this view. We must either receive this or one of three other theories of the explosion; namely, that it exploded by defective material (of which there is no proof) by too little water or too much pressure of steam. The phenomena of an explosion by too little water and by careening would be the same. Let us look first at these.

It is proved that Litton's Landing was bad, shallow, and rocky. The boat was coming up stream, and of course put in with her bow inclined to the shore; if she ran on a rock or on shore, being long and narrow with heavy upper works and in the habit of careening, it is highly probable she careened. If she did but three inches it was sufficient to expose the flue nearest shore, and if more, more surface would be exposed. Is it not probable she was ashore? Why did the pilot ring the alarm bell to prepare to back her. But if ashore with the flues exposed they would become heated, and if the pilot after ringing his bell, turned his wheel and threw the boat around, and it righted, it would have occurred just when it did and just as it did. But if the boat did not move thus, it did not move any other way, for the engine was still, was only being prepared to start. How then explain the explosion by there being too little water? Only by water coming from the pumps. But the pumps were attached to the engine, and it was still. If, therefore, the boat moved (as it must have done, to explain the explosion by too little supply of water, as well as by careening), it could only have been in the way which explains clearly the explosion by careening; and where there are two theories equally reasonable, the jury must choose the one that acquits rather than convicts. The only other explanation of the phenomenon is by excess of steam. But the boilers had a safety valve loaded with but 127 lbs. to a square inch, and about 3 lbs. extra. The boilers are said by the prosecution witnesses to have been A No. 1. Admit this. It is proved by other witnesses that such boilers are safe while lying still with 135 or 140 lbs. to the square inch. Now if the steam was excessive, that is, above a safe point, it could have raised the valve and have escaped. There is no evidence or reason to believe that there was any excess of pressure by steam gradually accumulated. The blackened bodies and boat so mysteriously drawn out, not being explained, we suppose was caused by the coal soot being scattered over them. While the idea of the people being burnt to death by some mysterious agent or gas, and that there was not enough water left to scald them, is absurd; when we know that five minutes before the boilers had enough to carry the boat without an explosion about two hundred yards up the river. There is no fact in the case inconsistent with the supposition of the careening of the boat, while every fact tends to support it. If, therefore,

you think the prosecution has proved enough to put us upon our defense, that defense, clearly proved we claim, is that the explosion was caused by the unavoidable accident of careening.

Mr. Mason replied.

McLEAN, Circuit Justice (charging jury). This, gentlemen, is a case arising under the 12th section of the act of congress of the 7th July, 1838, "for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." It provides "that every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person on board of said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court of the United States, shall be sentenced to confinement at hard labor for not more than ten years." Under this statute the defendant has been indicted as engineer on board of the steamboat Virginia, and that by his misconduct, negligence, and inattention to his duties, on a trip from Wheeling in Virginia, to Steubenville, in Ohio, the boilers of said boat exploded, which caused the death of several passengers on board of said boat, named, and of others not named. The word "engineer" is used in the statute to designate the individual who acts in that capacity, and the law holds him responsible as such. If he assumes to perform the important duties of an engineer, without the proper qualifications, his ignorance is no excuse, but rather an aggravation of his offense. Congress could not have supposed that any one would be employed in so important a trust, who did not possess the requisite qualifications. There is no situation which requires a more accurate knowledge of the power of steam, or a more matured experience, than that of engineer on board of a steamboat. I regard every steamboat as a floating volcano, freighted with human beings, which, from any want of attention by the engineer, is liable to explode, and to hurl them into eternity without a moment's warning. There are no elements in nature more destructive of life than those which are carried in the bosom of a steamboat. It overcomes the force of currents, the winds and the waves, impelled by a fiery agency, which, unless kept in subjection, destroys everything within its reach. How fearful is the responsibility of every one, who undertakes to govern a vessel thus propelled! His skill should be undoubted, his attention and vigilance unceasing. In case of an explosion, he can only be held guiltless by having done everything to avoid it, which a skillful engineer could have done, under the same circumstances. If he be guilty of misconduct, of negligence, or inattention, by which means life has been sacrificed, he is punishable under the law. The law deals with him, as one competent to perform the duties he has assumed, and he is required to exercise the skill of an instructed and vigilant engineer. But we do not understand that want of skill is relied upon as a defense in this case. I shall not refer to the facts in detail as stated by the witnesses, but the principal facts are admitted by the parties or stand uncontradicted. The explosion was more destructive of human life, in proportion to the size of the boat and the number of passengers on board, than any other, I believe, upon our western waters. But few escaped unharmed. Many were killed, their mangled bodies and separated limbs being thrown upon the land and upon the water, and others were seriously injured. Some of the survivors were thrown into the air and were found in and rescued from the water, others were found on the shore. The boat was made a perfect wreck. Its boilers were broken into fragments, some of which were found a great distance from the boat on the land, others fell in the water. The hull of the boat immediately sank. To produce

such consequences the steam must have been generated to its utmost height. It is for you, gentlemen of the jury, to inquire whether this explosion resulted from the misconduct, negligence, or inattention of the engineer. The proper determination of this question is of the utmost importance to the public, as well as to the prisoner. The safety of the traveling public on our western waters, demands that the evidence and the circumstances in all cases of this sort, should be most carefully investigated. While the innocent should be protected, the culpable instruments of such immeasurable calamity should not go unpunished. The fact of explosion is not prima facie evidence against the defendant, but it is part of the res gestæ essential to the prosecution, and without which it cannot be maintained. But in addition to this some inattention, negligence, or misconduct by the defendant, must be proved to authorize his conviction. On the part of the prosecution it is contended that as the boat stopped several times in eleven and a half miles from Wheeling the point of departure, to the landing where the explosion occurred, that greater care was necessary in letting off the steam than where the stoppages were less frequent. The force of this argument is sustained by experience. Rarely, if ever, do boilers explode when a boat is under way, unless the force of the steam be increased by extraordinary means.

One of the witnesses, Boals, stated that having occasion to go below, he found the defendant sitting between the boilers engaged in reading. This was near an hour before the explosion took place. He was, however, in full view of the machinery. The witness observed to him the boat was making greater speed than usual. The boat landed about one hundred and fifty yards below the place where the boilers exploded, and remained there five minutes. At that place no steam was let off. The fires were kept up. The boat then proceeded to the fatal landing, where it remained about five minutes before the engine was put in motion when the explosion occurred. There is no evidence that the steam was permitted to escape on the way from the last landing, or at the landing where the explosion took place. An attempt has been made to show that the boilers of the Virginia were defective, and that its structure, it being top heavy, rendered it unsteady, and liable to careen. And that in landing the bow of the boat may have been run on the shore, which would naturally incline the vessel to the side opposite the shore, and that on making back water to force the vessel from the shore, she would resume her erect position, which would throw the water into the heated, and measurably exhausted boilers, on the other side, which, probably produced the explosion. There is no evidence on which this conjecture is founded. If the bow of the boat, at the last landing, was run upon the shore, there is no proof of the fact.

It is also insisted that the boilers of the boat were defective. There was no competent evidence offered to prove this fact. Fragments alleged to be of the boilers were offered, and the statements of persons who had examined them, but they were not identified to be parts of the boilers of the Virginia. Some evidence has been given, which you will duly consider, tending to show the good conduct of the defendant on former occasions, while acting as an engineer on a steamboat.

Congress, by legislation on this subject, have endeavored to add somewhat to the security of passengers in traveling upon steamboats. They may not have done all that could be done by legislation. Under the commercial power they possess the exclusive authority to regulate steamboats and other vessels which are used in carrying on a commerce between two or more states. And if they shall fail to do what may be done by the exercise of legislative power, to advance this commerce and give safety to the traveling public, they are justly amenable to

public opinion. Whatever may be thought of other subjects which more immediately address themselves to the feelings and interests of congress, there is no subject connected with our western commerce more vitally interesting to the country.

The defense in this case has been ingeniously made. If the danger of steamboat traveling were more generally known and appreciated, less safety would be felt in that mode of traveling. But, gentlemen, we are not responsible for any defect of legislation on this subject. Our functions are exercised in giving effect to the law. And in the present case, if on a full and deliberate consideration of the facts and circumstances of this case, you are led to the conclusion that the calamity so much to be deplored, was occasioned·by any misconduct of the defendant, by want of skill, negligence. or inattention on his part, you will render a verdict of guilty. And, particularly, if you shall believe that it was his duty, as a careful and skillful engineer, to let off the steam at either or both of the last two landings, and that such failure caused the explosion, he is guilty under the statute. On the contrary, if you shall think. on weighing the evidence, that his duty was faithfully discharged, you will find him not guilty.

The jury returned a verdict of not guilty.