# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30122

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit
**FILED**
March 11, 2015
Lyle W. Cayce
Clerk

Plaintiff - Appellant

v.

ROBERT KALUZA; DONALD VIDRINE,

Defendants - Appellees

Appeals from the United States District Court for the
Eastern District of Louisiana

Before HIGGINBOTHAM, JONES, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

On April 20, 2010, a blowout of oil, natural gas, and mud occurred during deepwater drilling operations at the Macondo well, located on the Outer Continental Shelf ("OCS") in the waters of the Gulf of Mexico. At the time of the blowout, the *Deepwater Horizon*, a drilling rig chartered by BP plc ("BP") from Transocean Ltd. ("Transocean"), was attached to the Macondo well. Eleven men died from the resulting explosions and fires on the *Deepwater Horizon*. The blowout resulted in the discharge of millions of barrels of oil into the Gulf of Mexico.

Robert Kaluza and Donald Vidrine ("Defendants") were "well site leaders," the highest ranking BP employees working on the rig. Defendants were indicted by a federal grand jury in the Eastern District of Louisiana on

No. 14-30122

23 counts, including 11 counts of seaman's manslaughter in violation of 18 U.S.C. § 1115. The district court granted Defendants' motion to dismiss for failure to charge an offense because neither defendant fell within the meaning of the criminal statute. The government appeals this determination. Because we agree that neither defendant falls within the meaning of the phrase "[e]very . . . other person employed on any . . . vessel," we AFFIRM.

I

A

In May 2008, BP, through one of its affiliated companies, obtained a lease from the United States to the oil and natural gas reservoirs at a site on the OCS in the Gulf of Mexico. The first well drilled by BP at this site was referred to as the Macondo well, approximately 48 miles from the Louisiana shoreline. The seabed was approximately 5,000 feet below sea level, and the potential reservoirs were located more than 13,000 feet below the seabed. BP and its affiliates entered into contracts with Transocean, whereby Transocean provided, *inter alia*, a drilling rig and crews to drill the Macondo well under BP's supervision. BP began drilling the Macondo well in October 2009 using Transocean's *Marianas* drilling rig and crew, but that work was halted in November 2009 due to a hurricane. In April 2010, BP resumed drilling the Macondo well using Transocean's *Deepwater Horizon* drilling vessel and crew.

The *Deepwater Horizon* was a mobile offshore drilling rig. It was "a dynamically-positioned semi-submersible deepwater drilling vessel."[1] The rig floated on two enormous pontoons extending 30 feet below the ocean's surface that acted as the vessel's hull, provided stability to the rig, kept the rig afloat, and allowed the drilling floor and other work areas to remain safely above the

---

[1] *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. 2011) (citations omitted).

2

water's surface. The *Deepwater Horizon* employed dynamic satellite positioning technology connected to directional thrusters that allowed the vessel to maintain its place over the wellhead. The rig had no legs or anchors connecting it to the seabed.

When the *Deepwater Horizon* arrived at the Macondo well, the crew assembled a drilling structure that attached the rig to the wellhead: the structure consisted of the Blow Out Preventer stack ("BOP") and the marine riser. The BOP, attached directly to the wellhead, was a five-story, 300-ton stack of components designed to close the well in case of an emergency. The BOP was attached to the marine riser, a pipe that was approximately 5,000 feet long and made primarily out of steel, twenty inches in diameter. The marine riser, in turn, was attached to the drill floor on the rig. In order to assemble this drilling structure, a section of the marine riser was joined to the BOP and then, as additional riser sections were added, the BOP was lowered to the seabed; remotely operated vehicles latched the BOP to the wellhead. All materials necessary to drill the well—the drilling tools, drilling mud, and other fluids—passed from the rig through the marine riser down to the wellhead.

The *Deepwater Horizon* maintained separate crews for different tasks, such as the "marine crew" and the "drill crew."[2] The marine crew was provided in its entirety by Transocean, and consisted of the master (i.e., the captain), the chief mate, the chief engineer, assistant engineers, dynamic positioning officers, able bodied seamen, the boatswain, and the offshore installation manager.[3] During the time that the vessel was attached to the well, certain

---

[2] There was also a "support crew" and other personnel not relevant to this appeal.

[3] 1 U.S. Coast Guard, *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking and Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon in the Gulf of Mexico, April 20–22, 2010* app. D, D-4 (2011) [hereafter *Coast Guard Rep.*].

marine crew members were responsible for maintaining the location of the vessel over the wellhead. The drill crew was provided in part by BP, Transocean, and other companies, and consisted of the well site leaders, toolpushers (i.e, drilling managers), the chief engineer, other engineers, drillers, assistant drillers, floorhands, roustabouts, mudloggers, and various other personnel.[4]

Although BP did not own the rig nor operate it in the normal sense of the word because daily production involved few BP employees, BP's engineering team designed the well and oversaw the implementation of the design. Most of BP's team for the *Deepwater Horizon* were based on shore. However, there were seven BP employees on the rig on the day of the explosion. Specifically, the two well site leaders were BP employees who were on the vessel at all times, splitting responsibility by 12-hour shifts, to direct the drill crew and contractors in their work while maintaining regular contact with the BP engineers on shore. The well site leaders were "the top BP employees" on the rig, and were known as "the company men." They were "the company's eyes and ears," making "important decisions regarding the course of drilling operations." According to BP's Drilling and Wells Operation Practice manual, the well site leaders were accountable for the execution of drilling and well operations in compliance with BP's health, safety, security, and environmental requirements. Under a different BP guide, in case of a well control incident, the well site leader was "responsible for ensuring all activities are carried out

---

Although the offshore installation manager is listed as a member of the marine crew, his duties were more related to the drill crew. The master was in charge of the rig when it was moving from location to location. Once the rig arrived at a site and began drilling-related operations, the offshore installation manager took over, and the members of the drill crew provided by Transocean reported to him. Nat'l Comm'n on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Macondo: The Gulf Oil Disaster, Chief Counsel's Report* 33 (2011) [hereafter *Chief Counsel's Rep.*].

[4] *Coast Guard Rep.* app. D, D-5 to D-8; *Chief Counsel's Rep.* at 30-34.

in a safe and efficient manner at the location, and for proactively promoting the health, safety and welfare of all personnel on the Rig." Kaluza and Vidrine were the two well site leaders aboard the *Deepwater Horizon* on the day of the explosion.

Kaluza and Vidrine were industry veterans. Kaluza has a degree in petroleum engineering and 35 years' experience in the oil and gas industry, including more than eight years as a well site leader. He was ordinarily assigned to another rig, but was serving on the *Deepwater Horizon* on the day of the explosion. Vidrine had been a well site leader for more than 30 years. He had been working on the *Deepwater Horizon* since January 2010, and had previously worked on the Macondo well as a well site leader onboard another rig.

Well site leaders were responsible for conducting and assessing the validity of "negative pressure testing" or "negative testing," a process which assessed whether the cement pumped to the bottom of the well had hardened, thus forming an effective barrier between the well and the oil and gas reservoir. During the negative testing, the well was monitored for pressure increases and fluid flows. Either condition would indicate that the well was not secure and that oil and natural gas could be entering the well. An uncontrolled influx of fluids and gas from the surrounding rock into the well—known as a "kick"—could cause a catastrophic blowout up the well and onto the rig with the potential for ignition, explosions, casualties, death, and environmental damage. Competent negative testing was critical.

On April 20, 2010, the *Deepwater Horizon* crew was engaged in procedures to temporarily abandon the Macondo well, sealing it with cement so that a different vessel could later retrieve the oil and natural gas reserves. As part of this procedure, they attempted to perform negative tests multiple times to assess whether the well was properly sealed. Both defendants

No. 14-30122

participated in the negative testing. The indictment alleges that Defendants negligently or grossly negligently:

> failed to phone engineers onshore to advise them during the negative testing of the multiple indications that the well was not secure; failed to adequately account for the abnormal readings during the testing; accepted a nonsensical explanation for the abnormal readings, again without calling engineers onshore to consult; eventually decided to stop investigating the abnormal readings any further; and deemed the negative testing a success, which caused displacement of the well to proceed and blowout of the well to later occur.

After the failed negative testing, the well blew out within hours, the vessel exploded, eleven men died, and others were severely injured.

B

A federal grand jury in the Eastern District of Louisiana returned a 23-count superseding indictment charging Defendants with 11 counts of involuntary manslaughter in violation of 18 U.S.C. § 1112 (Counts 1-11); 11 counts of seaman's manslaughter in violation of 18 U.S.C. § 1115 (Counts 12-22); and 1 count of negligent discharge under the Clean Water Act in violation of 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3) (Count 23).

Defendants filed motions to dismiss based on several theories. With regard to Counts 12-22 (seaman's manslaughter), they first argued that the *Deepwater Horizon* was outside the territorial jurisdiction of the United States, and that § 1115 does not apply extraterritorially.[5] Second, Defendants argued that Counts 12-22 did not charge an offense—that they were not persons covered under 18 U.S.C. § 1115. Defendants also moved to dismiss all counts,

---

[5] Defendants also moved to dismiss Counts 1-11 (involuntary manslaughter), arguing that the *Deepwater Horizon* was outside the special maritime and territorial jurisdiction of the United States and thus that § 1112 did not apply on the rig by its terms. *See* § 1112(b).

No. 14-30122

arguing that the underlying statutes were unconstitutionally vague as applied. The district court denied the motions to dismiss related to the *Deepwater Horizon*'s extraterritorial location, finding that the Outer Continental Shelf Lands Act (OCSLA) "extends federal law and political jurisdiction" to the rig, but dismissed Counts 12-22 for failure to charge an offense. The district court then denied the motion to dismiss for unconstitutional vagueness.

The government now appeals the dismissal of Counts 12-22, arguing that Defendants are persons covered under § 1115. Defendants urge alternatively that § 1115 did not apply on the *Deepwater Horizon* because it lacks extraterritorial reach, and the OCSLA did not apply federal law generally to the rig.

## II

We review the district court's legal determination regarding subject matter jurisdiction *de novo*.[6] We also review the district court's interpretation and application of a federal statute *de novo*.[7]

## III

We begin by examining subject matter jurisdiction. "Federal subject matter jurisdiction is limited and must be conferred by Congress within the bounds of the Constitution."[8] Subject matter jurisdiction involves "the courts' statutory or constitutional *power* to adjudicate the case,"[9] and it can "never be forfeited or waived."[10] "The objection that a federal court lacks subject-matter

---

[6] *United States v. Urrabazo*, 234 F.3d 904, 906 (5th Cir. 2000).

[7] *United States v. Gore*, 636 F.3d 728, 730 (5th Cir. 2011).

[8] *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011).

[9] *United States v. Cotton*, 535 U.S. 625, 630 (2002) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998)).

[10] *Id.*

No. 14-30122

jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."[11]

In the criminal context, subject matter jurisdiction is straightforward.[12] Here, the district court had subject matter jurisdiction under 18 U.S.C. § 3231, which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." As this is an appeal by the United States, we have jurisdiction pursuant to 18 U.S.C. § 3731.

IV

We find no occasion to address Defendants' argument that 18 U.S.C. § 1115 did not extend to the *Deepwater Horizon* because this issue does not concern subject matter jurisdiction and was not properly appealed.

Defendants argued below that the district court did not have "jurisdiction" because § 1115 did not extend to the *Deepwater Horizon*. The argument was that neither territorial nor extraterritorial jurisdiction existed. First, territorial jurisdiction did not obtain because the *Deepwater Horizon* was a foreign-flag vessel and operated in international waters 48 nautical miles from the coastline.[13] Second, extraterritorial jurisdiction did not obtain because the government had not overcome the presumption against extraterritorial application of federal law.[14] In response, the government relied

---

[11] *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citation omitted); *see also* Fed. R. Crim. P. 12(b)(2) ("A motion that the court lacks jurisdiction may be made at any time while the case is pending.") (previously at 12(b)(3)(B)).

[12] *United States v. Scruggs*, 714 F.3d 258, 262 (5th Cir. 2013).

[13] *See United States v. Jho*, 534 F.3d 398, 405-06 (5th Cir. 2008) (noting that under international law a ship is subject to the territorial jurisdiction of its flag state); Antiterrorism & Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 901(a), 110 Stat. 1214, 1317 (extending territorial jurisdiction to the territorial sea of the United States, i.e, 12 nautical miles from the coastline).

[14] *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.")

No. 14-30122

solely on the Outer Continental Shelf Lands Act ("OCSLA"), which explicitly extends federal law to the OCS and certain attachments to it. The district court agreed with the government, holding that the OCSLA extended federal law including § 1115 to the rig.

The provision of the OCSLA that the district court relied on was 43 U.S.C. § 1333(a)(1), which provides that:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and *all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon* for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.[15]

As we have explained, this provision imposes a situs test for the extension of federal law. "The OCSLA applies to all of the following locations":

> (1) the subsoil and seabed of the OCS;
> (2) any artificial island, installation, or other device if
>      (a) it is permanently or temporarily attached to the seabed of the OCS, and
>      (b) it has been erected on the seabed of the OCS, and
>      (c) its presence on the OCS is to explore for, develop, or produce resources from the OCS;
> (3) any artificial island, installation, or other device if
>      (a) it is permanently or temporarily attached to the seabed of the OCS, and

---

(citations omitted) (internal quotation marks omitted); *see also Kiobel v. Royal Dutch Petrol. Co.*, 133 S. Ct. 1659, 1664 (2013) ("[The presumption against extraterritorial application] provides that [w]hen a statute gives no clear indication of an extraterritorial application, it has none.") (citations omitted) (internal quotation marks omitted).

[15] 43 U.S.C. § 1333(a)(1) (emphasis added).

No. 14-30122

(b) it is not a ship or vessel, and
(c) its presence on the OCS is to transport resources from the OCS.[16]

There is no question that the *Deepwater Horizon* could not qualify as an OCSLA situs under either the first or third categories. The first category does not apply by its terms; the third category does not apply because the *Deepwater Horizon* was a vessel.[17] For the *Deepwater Horizon* to be an OCSLA situs—so extending federal law, including § 1115, to the rig—it had to qualify within the second category. At the district court level, Defendants argued that the rig did not qualify as an OCSLA situs because it was not "erected on the seabed of the OCS." The government argued the square opposite, and the district court agreed with the government.

Defendants now try to renew this argument. However, we do not address it. To begin, the issue of whether the rig was an OCSLA situs does not implicate subject matter jurisdiction. We have previously explained that there are different provisions within the OCSLA for subject matter jurisdiction and choice of law. Through 43 U.S.C. § 1349(b)(1), the OCSLA grants subject matter jurisdiction to federal district courts.[18] By contrast, § 1333 is a choice-of-law provision that defines the applicable law on the OCS—whether federal,

---

[16] *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 497 (5th Cir. 2002), *overruled in part, on other grounds, by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc).

[17] Neither party contested the district court's assessment that the *Deepwater Horizon* was a vessel. In addition, we have previously treated the rig as a vessel. *In re Deepwater Horizon*, 745 F.3d 157, 164-66 (5th Cir. 2014); *In re Deepwater Horizon*, 753 F.3d 570, 571-74 (5th Cir. 2014); *see also* 33 C.F.R. § 140.10 ("Mobile offshore drilling unit or MODU means a vessel . . . capable of engaging in drilling operations for exploration or exploitation of subsea resources.").

[18] Section 1349(b)(1) grants district courts "jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."

maritime or state. We have held that this subject matter jurisdiction inquiry should not be conflated with the choice-of-law inquiry.[19] Although the district court was exercising subject matter jurisdiction on a different basis—namely § 3231, not § 1349(b)(1)—the principle is the same; the inquiry regarding § 1333(a)(1)'s applicability does not raise subject matter jurisdiction issues. Defendants' argument instead goes to whether an offense is charged.[20] The question of whether the government has charged an offense goes to "the merits of the case,"[21] and the district court has the power to determine "whether the offense charged is a true offense."[22] Therefore, we are not obligated to examine this issue unless it has been properly appealed.

But this issue has not been properly appealed. While the United States appealed the district court's determination that Defendants did not fall within the meaning of § 1115, Defendants failed to cross-appeal the district court's determination that the *Deepwater Horizon* was erected on the seabed of the

---

[19] *In re Deepwater Horizon*, 745 F.3d at 164 ("[The] attempt to intertwine the Section 1349 jurisdictional inquiry with OCSLA's choice of law provision, 43 U.S.C. § 1333, fails because the provisions and the issues they raise are distinct.").

[20] *See Morrison*, 561 U.S. at 254 ("But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case.") (internal quotation marks omitted); *United States v. Yousef*, 750 F.3d 254, 261-62 (2d Cir. 2014) ("In the criminal context, 18 U.S.C. § 3231 is all that is necessary to establish a court's power to hear a case involving a federal offense, whether or not the conduct charged proves beyond the scope of Congress' concern or authority in enacting the statute at issue."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1340-43 (D.C. Cir. 2004) (finding that defendants' argument that the statute of conviction did not apply extraterritorially, and thus that no offense had been stated against them, did not deprive the district court of subject matter jurisdiction); *see also United States v. Baker*, 609 F.2d 134, 135 (5th Cir. 1980) (in case hinging on whether possession with intent to distribute statute applied outside the territorial United States, framing the issue as whether or not the conduct "is a crime under 21 U.S.C.A. s 841(a)(1)").

[21] *Cotton*, 535 U.S. at 631; *see also Scruggs*, 714 F.3d at 262; *United States v. Longoria*, 298 F.3d 367, 372 (5th Cir. 2002) (en banc) (recognizing that the Supreme Court in *Cotton* overruled Fifth Circuit cases which had stated that failure to charge an offense was a "jurisdictional" error).

[22] *Delgado-Garcia*, 374 F.3d at 1342 (quoting *Lamar v. United States*, 240 U.S. 60, 65 (1916)).

No. 14-30122

OCS and OCSLA applied. "It is settled that an appellee may urge any ground available in support of a judgment even if that ground was earlier and erroneously rejected by the trial court."[23] But where the defendant fails to cross-appeal, his "failure to file a notice of appeal precludes him from receiving affirmative relief in this court."[24] In other words, if the government appeals and the defendant fails to cross-appeal, the defendant's rights under the judgment cannot be expanded.[25] Were we to reach the OCSLA situs issue and rule in Defendants' favor, that ruling would not only preserve the rights of Defendants, but would expand their rights. This because Defendants' liability under 18 U.S.C. § 1112—an issue not before us—also hinges on the OCSLA's extension of federal law to the *Deepwater Horizon*. Finally, Defendants themselves urge that we reach this issue only in the alternative, in case they do not prevail on the merits.

For all these reasons, we decline to decide whether the district court erred in deciding that the *Deepwater Horizon* qualified as an OCSLA situs because the issue is not properly before us.

V

We next turn to the merits of this appeal. Known as the "seaman's manslaughter" or "ship officer manslaughter" provision, § 1115 is currently titled "Misconduct or neglect of ship officers" and provides that:

> *Every captain, engineer, pilot, or other person employed on any steamboat or vessel*, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance,

---

[23] *Castellano v. Fragozo*, 352 F.3d 939, 960 (5th Cir. 2003) (en banc).

[24] *United States v. Coscarelli*, 149 F.3d 342, 343 (5th Cir. 1998) (en banc).

[25] *See id.* at 342-44; *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("Under [the cross-appeal rule], an appellate court may not alter a judgment to benefit a nonappealing party.").

> misconduct, or violation of law the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.
>
> When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.[26]

Unlike the common law definition of manslaughter and the companion statutory definition for general manslaughter found in Section 1112, Section 1115 only requires the proof of any degree of negligence to meet the culpability threshold.[27] Moreover, the statute holds liable three groups of individuals:

(1) Every captain, engineer, pilot, or other person employed on any steamboat or vessel,

(2) Every owner, charterer, inspector, or other public officer, and

(3) When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel.[28]

Neither the second category (the owner provision) nor the third category (the corporate officer provision) is at issue; it is only the first category with which we are concerned. Specifically, the phrase "[e]very . . . other person employed on any . . . vessel" is the only relevant one because Defendants are not captains, engineers, or pilots and because the *Deepwater Horizon* was not a steamboat.

---

[26] 18 U.S.C. § 1115 (emphasis added).

[27] *United States v. O'Keefe* (*O'Keefe II*), 426 F.3d 274, 278-79 (5th Cir. 2005). *Compare* 18 U.S.C. § 1112, *with id.* § 1115.

[28] *See* 18 U.S.C. § 1115.

No. 14-30122

The government argued below that the phrase was not ambiguous, and that the plain text included Defendants. The district court disagreed. It reasoned that the statute was ambiguous, and applied the principle of *ejusdem generis*[29] to define the phrase. The district court held that the phrase covered only persons with responsibility for the "marine operations, maintenance, and navigation of the vessel." Since Defendants were not such persons, they did not fall within the ambit of the statute.

A

On appeal, the government argues that the plain meaning of the statute is not ambiguous. The ordinary meaning of the phrase "[e]very . . . other person employed on any . . . vessel" easily encompasses Defendants. As confirmation of this plain text interpretation, the government points to the plain text of the other provisions in § 1115. It also points to others indicators—including statutory development, drafting history, statutory context, title, statutory purpose, and case law. The government argues that since the plain language is unambiguous, it was error to invoke *ejusdem generis*. Finally, the government points to the principle of *ex abundanti cautela*.[30]

In response, Defendants argue that *ejusdem generis* is not a canon of last resort, but rather a fundamental canon of statutory construction. There is no need to find ambiguity in the statute to apply the canon. Rather, Defendants argue that the government's position would lead to making the words "captain, engineer, [and] pilot" superfluous, and that *ejusdem generis* has to be applied

---

[29] 2A Norman Singer & J.D. Shambie Singer, *Sutherland on Statutes and Statutory Construction* §47:17 (7th ed. 2014) ("*Ejusdem generis* means 'of the same kind,' and is a variation of the maxim *noscitur a sociis*. *Ejusdem generis* instructs that, where general words follow specific words in an enumeration describing a statute's legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (footnotes omitted)).

[30] *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 140 (2001) (Souter, J., dissenting) (defining *ex abundanti cautela* as the abundance of caution principle).

to give meaning to each word. Finally, Defendants argue that the principle of *noscitur a sociis*[31] also applies.

"The starting point in discerning congressional intent is the existing statutory text . . . ."[32] "When faced with questions of statutory construction, 'we must first determine whether the statutory text is plain and unambiguous' and, '[i]f it is, we must apply the statute according to its terms.'"[33] The parties disagree on whether the plain text of the statute needs to be found ambiguous before a canon of construction, such as *ejusdem generis*, can be applied.[34] However, as we explain below, the plain text of the statute is ambiguous, necessitating the use of canons of construction. In any case, there is no doubt that legislative history can only be a guide after the application of canons of construction. "Only after application of principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history. For the language to

---

[31] 2A Singer & Singer, *supra* note 29, §47:16 ("*Noscitur a sociis* means literally 'it is known from its associates,' and means practically that a word may be defined by an accompanying word, and that, ordinarily, the coupling of words denotes an intention that they should be understood in the same general sense." (footnote omitted)).

[32] *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

[33] *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) (quoting *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009)).

[34] Precedent from the Supreme Court is not entirely clear on this point either. *Compare Garcia v. United States*, 469 U.S. 70, 74-75 (1984) (refusing to apply *ejusdem generis* because, among other things, the statute had a plain and unambiguous meaning), *with Circuit City Stores*, 532 U.S. at 114-20 (majority opinion) (applying *ejusdem generis* before concluding that the text was clear). Neither is precedent from our Court. *Compare United States v. Barlow*, 41 F.3d 935, 942 (5th Cir. 1994) (suggesting that a statute has to be opaque, translucent, or ambiguous before canons of statutory interpretation can be applied, including a resort to the rule of lenity and legislative history), *with Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 451 (5th Cir. 2008) (suggesting that statutory ambiguity can only be established after application of the principles of statutory construction, including the canons of construction).

be considered ambiguous, however, it must be susceptible to more than one reasonable interpretation or more than one accepted meaning."[35]

"When construing statutes and regulations, we begin with the assumption that the words were meant to express their ordinary meaning."[36] The government contends that the plain meaning of § 1115 is unambiguous as it contains no complicated or technical language. The definitions of each word in the phrase "[e]very . . . other person employed on any . . . vessel" are straightforward.

"Every" is defined as "[c]onstituting each and all members of a group without exception" or "[b]eing all possible."[37] "Other" is defined as "[b]eing the remaining ones of several."[38] "Person" is defined by the Dictionary Act to include individuals.[39] "Employed" is defined as "engaged in work or occupation; having employment; *esp.* [a person] that works for an employer under an employment contract."[40] "On" is "[u]sed to indicate position above and supported by or in contact with" an object.[41] "Any" "has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"[42] "Vessel" is also defined by the Dictionary Act as "includ[ing] every description of watercraft or other artificial contrivance used, or capable of being used, as a means of

---

[35] *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004) (internal citation quotation marks, and footnote omitted).

[36] *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012).

[37] *The American Heritage Dictionary of the English Language* (5th ed. 2014), *available at* http://www.ahdictionary.com (accessed online).

[38] *Id.*

[39] 1 U.S.C. § 1.

[40] *Oxford English Dictionary* (3d ed. 2014), *available at* http://www.oed.com (accessed online); *see also* The American Heritage Dictionary of the English Language (defining "employ" as "[t]o provide work to (someone) for pay").

[41] *The American Heritage Dictionary of the English Language.*

[42] *United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)).

transportation on water."[43] There is no question that the *Deepwater Horizon* was a vessel.[44]

Looking to these definitions, the government contends that the plain text of the phrase "[e]very . . . other person employed on any . . . vessel" is clear and unambiguous, bringing within its ambit every person employed on the *Deepwater Horizon*. Defendants, however, argue that the plain text is ambiguous because it is not clear whether the phrase does incorporate every person employed on the rig. Indeed, such an interpretation would render "captain," "engineer," and "pilot" superfluous. We agree. Both interpretations of the statute are reasonable. On the one hand, the phrase could be read to include everyone employed on the vessel. On the other hand, because such a reading would render certain terms superfluous, the phrase could be read to include a smaller group of those employed on the vessel. This ambiguity necessitates the use the canon of construction of *ejusdem generis*.

The government's argument that this Court has previously held § 1115 unambiguous fails. In *United States v. O'Keefe* (*O'Keefe II*), we held that certain "terms [of § 1115] are unambiguous and therefore must be given their plain meaning."[45] In that case, this Court was dealing with Defendants' argument that the phrase "misconduct, negligence, or inattention" in § 1115 required the proof of either gross negligence or heat of passion.[46] Reading the plain text of the phrase "misconduct, negligence, or inattention," this Court found no ambiguity and affirmed that any degree of negligence was sufficient to obtain a conviction.[47] But that holding has no bearing on the meaning of "[e]very . . . other person employed on any . . . vessel."

---

[43] 1 U.S.C. § 3.
[44] *See supra* note 17.
[45] *O'Keefe II*, 426 F.3d at 279.
[46] *Id.*
[47] *Id.* at 278-79.

No. 14-30122

The government also argues that the invocation of *ejusdem generis* is improper for other reasons. First, the government argues that the term "every other person" is already qualified by the requirement that they be "employed on any steamboat or vessel." Pointing to this limitation, the governments urges against further limitation. However, this argument does not answer the question of ambiguity inherent in the phrase "every other person." Second, the government argues there is no meaningful way to define the common attributes between "captain," "engineer," and "pilot," rendering the canon ineffectual.[48] To our eyes, however, the common attribute can be defined and applied to exclude Defendants. Third, the government argues that the "textbook" grammatical structure of the phrase is not enough to justify the use of *ejusdem generis*. The government points to cases where the Supreme Court and our Court have refused to read a statute using this canon of construction because the narrow reading was not "supported by evidence of congressional intent over and above the language of the statute."[49] We do not disagree with this accent, but emphasize below that the narrow reading using *ejusdem generis* comports with the statute's context, history, and purpose. Fourth, the government argues for the application of the principle of abundance of caution, which recognizes that Congress sometimes includes certain categories, though redundant, to ensure their inclusion in a list.[50] However, as explained below, *ejusdem generis* is the most appropriate canon of application in this case

---

[48] *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008); *In re Dale*, 582 F.3d 568, 574-75 (5th Cir. 2009); *United States v. Amato*, 540 F.3d 153, 160-61 (2d Cir. 2008).

[49] *United States v. Powell*, 423 U.S. 87, 90 (1975); *see also United States v. Alpers*, 338 U.S. 680, 682-83 (1950); *United States v. Silva-Chavez*, 888 F.2d 1481, 1483-84 (5th Cir. 1989).

[50] *See Ali*, 552 U.S. at 226 ("Congress may have simply have intended to remove any doubt that officers of customs or excise were included in 'law enforcement officer[s].'"); *Alpers*, 338 U.S. at 684 (holding that Congress added a superfluous term because it "was preoccupied with making doubly sure" that the term was included within the coverage of the statute).

No. 14-30122

because it comports with the statute's text wherein three specific terms are followed by a general term. By contrast, the abundance of caution principle is more appropriate when the "[t]he phrase is disjunctive, with one specific and one general category, not . . . a list of specific items separated by commas and followed by a general or collective term."[51] Therefore, the district court's invocation of *ejusdem generis* was entirely proper.

B

Under the principle of *ejusdem generis*, "where general words follow an enumeration of specific terms, the general words are read to apply only to other items like those specifically enumerated."[52] "The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty."[53] Importantly, the rule cannot be used to "obscure and defeat the intent and purpose of Congress" or "render general words meaningless."[54] "Canons of construction need not be conclusive and are often countered, of course, by some maxim pointing in a different direction."[55] "The limiting principle of *ejusdem generis* has particular force with respect to criminal statutes, which courts are compelled to construe rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language."[56]

---

[51] *Ali*, 552 U.S. at 225.

[52] *Garcia*, 469 U.S. at 74; *see also Hilton v. Sw. Bell Tel. Co.*, 936 F.2d 823, 828 (5th Cir. 1991) ("When general words follow an enumeration of persons or things, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. The rule is one of limitation, restricting general terms, such as 'any other' and 'and the like,' which follow specific terms, to matters similar to those specified.").

[53] *Powell*, 423 U.S. at 91 (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)).

[54] *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2171 (2012) (quoting *Alpers*, 338 U.S. at 682).

[55] *Circuit City Stores*, 532 U.S. at 115.

[56] *United States v. Insco*, 496 F.2d 204, 206 (5th Cir. 1974).

The district court considered what "common attribute" or "class of persons" the statutory phrase implied. It concluded that in the context of the phrase, the terms "captain," "engineer," and "pilot" suggested a class of persons dealing with the operation and navigation of the vessel. Thus "every . . . other person" includes only those persons responsible for the "marine operations, maintenance, or navigation of the vessel." As a result, Defendants were excluded. The district court then consulted the legislative history and case law to confirm that Congress intended such a limitation. It noted that that the predecessor to § 1115 was enacted in 1838 to "provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam,"[57] at a time when "steamboat collisions and boiler explosions were regular occurrences." The district court inferred that Congress intended "to hold those persons responsible for navigating the vessel accountable for their actions." Next, it noted that § 1115 had never been applied to employees on a drilling rig.

The government argues that even if the district court did not err in invoking *ejusdem generis*, it defined the common attribute incorrectly. According to the government, there are several other ways of defining the common attributes of "captain, engineer, [and] pilot." First, the government argues that "captain," "engineer," and "pilot" all denote individuals who work in service of the vessel. Second, that each is a person in a position of authority or with a substantial degree of responsibility for the safety of the vessel. Third, that each is responsible for the "operation, equipment, or navigation" of the vessel. By contrast, the government contends that the common attribute found by the district court has no purchase in the statutory text. Defendants argue that the district court correctly found that the common attribute involved

---

[57] *See* Act of July 7, 1838, ch. 191, 5 Stat. 304.

persons responsible for the "marine operations, maintenance, or navigation of the vessel."

We find that the district court's definition of the common attribute was correct. The three specific words define a general class of people, specifically those involved in the "marine operations, maintenance, or navigation of the vessel." This conclusion is bolstered by examining the meaning of the terms "captain," "engineer," and "pilot." As relevant here, "Captain" is defined as "[t]he master or commander of a merchant ship or of any kind of vessel."[58] "Engineer" is defined as "[t]he operator of a steam engine, esp. on board a ship."[59] "Pilot" is defined as "[a] person who steers or directs the course of a ship; a helmsman or navigator, *spec.* a qualified coastal navigator taken on board temporarily to steer a ship into or out of a port, through a channel, etc."[60] All three terms refer to individuals involved in the "marine operations, maintenance, or navigation of the vessel."[61] In other words, all three are persons in positions of authority responsible for the success of a vessel *qua* vessel, i.e., in its function as something used or capable of being used as a means of transportation on water. Defendants do not fall within this definition.

The government's alternative common attributes do not persuade. As to the first one, defining the common attribute as someone "in service of the vessel" is too broad. For instance, a nanny employed by the vessel operator would fall under this definition. Congress did not intend to bring such a person within the scope of the statute. As to the second proffered definition, defining

---

[58] *Oxford English Dictionary.*

[59] *Id.*

[60] *Id.*

[61] All three also refer to persons in positions of authority, i.e., ship officers. The district court decided that the "persons in positions of authority" qualifier did not constitute an additional limiting common attribute. We need not decide whether the district court erred in this conclusion because, in any case, Defendants do not fall within the meaning of persons responsible for "marine operations, maintenance, or navigation of the vessel."

the common attribute as someone in a position of authority or with a substantial degree of responsibility for the safety of the vessel sweeps too broadly. This because it fails to take into account that the "captain," "engineer," and "pilot" are all required for the *transportation* function of the vessel. Suppose a vessel had an armed guard officer to protect against pirates and other assailants. Under the government's definition, such a person would be within the statutory meaning. But based on the statutory text and purpose, we are not persuaded that the statute was drafted to include such a person. As to the third proffered definition, characterizing the common attribute as responsibility for the "operation, equipment, or navigation" of the vessel has some appeal. This phrase is derived from the corporate officer provision of § 1115, and it does have purchase in the text. But this formulation likewise fails to account for the transportation-related duties conspicuously common to "captain," "engineer," and "pilot."

The government argues that even if the common attribute is persons in positions of responsibility who are involved in the "marine operations, maintenance, or navigation of the vessel," Defendants still fall within that definition. First, the government argues that the term "marine" cannot exclusively mean navigational activities or transporting passengers over water. Such a definition would be too restrictive. A captain has non-navigational duties because he is responsible for the entire vessel; an engineer's duties extend beyond propelling the vessel because the engineer also is responsible for the entire physical plant on the vessel, including air conditioning and refrigeration systems. To wit, the government argues that certain drilling engineers could also be held responsible under the statute. This argument echoes another argument of the government in support of the plain text interpretation: that the statute on its face does not limit the liability of "captain," "engineer," and "pilot" to only their failure in "marine" duties. There

is a certain tension here. If Defendants were "captains," "engineers," and "pilots," they could be responsible under § 1115 for failure in their *non*-marine duties. Nevertheless, *ejusdem generis* mandates that the general phrase ought to be limited to persons who are at least sometimes involved in the "marine operations, maintenance, or navigation of the vessel." Indeed, to say that engineers solely responsible for drilling were meant to be within the ambit of the statute takes the argument too far.

Second, the government argues that drilling could also be characterized as a "marine" function. In its eyes, a certain activity is "marine" simply because it is performed on water. Thus, Defendants were responsible for "marine operations" at the least. It is true that drilling might be characterized as a "marine" activity. But as we explained above, here, the "marine" limitation has to do with the vessel functioning as a vessel, i.e., in the transportation of people and things. This limitation is mandated by *ejusdem generis*, and the district court did not err in understanding "marine" this way.

Our reading of § 1115 is also supported by the other textual provisions within the statute. "In reading a statute, we must not look merely to a particular clause, but consider in connection with it the whole statute."[62] Although these provisions were added later by different sessions of Congress, they must be read consistently with earlier parts of the statute.[63] The owner provision—the second category of persons liable under § 1115—provides liability for "every owner, charterer, inspector, or other public official," and it is consistent with the exclusion of Defendants from the first category. While the owner provision does not have a similar limitation to "marine operations,

---

[62] *Dada v. Mukasey*, 554 U.S. 1, 16 (2008) (internal quotation marks omitted).

[63] *Ali*, 552 U.S. at 222 ("Nonetheless, the [later] amendment is relevant because our construction of [the term] must, to the extent possible, ensure that the statutory scheme is coherent and consistent.").

No. 14-30122

maintenance, or navigation of the vessel," it also lacks a general phrase. Next, the corporate officer provision—the third category—provides liability for "any executive officer" of the corporate owner or charterer of a vessel "for the time being actually charged with the control and management of the operation, equipment, or navigation" of such vessel "who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed." Again, there is no limitation in this provision to "marine operations, maintenance, or navigation of the vessel." But this is consistent with the text because the corporate officer provision has a stricter *mens rea* requirement: knowingly and willfully causing or allowing.

We find some guidance in the current title of § 1115: "Misconduct or neglect of ship officers." "[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute."[64] First, the reference to "ship officers" suggests that our focus on the "marine" nature of the common attribute is not misplaced. Second, the title suggests that only persons in positions of authority are liable.[65] As we explain below, however, the title was added long after the enactment of the manslaughter provision, and thus can offer only limited help.

Therefore, the text and context of § 1115 supports the conclusion that Defendants do not fall within the meaning of the statute.[66]

---

[64] *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (internal quotation marks omitted).

[65] *See supra* note 60.

[66] We agree with the district court that the application of *noscitur a sociis* is unnecessary here. Under that canon, "a term is interpreted by considering the meaning of the terms associated with it." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 218 (5th Cir. 2007). Here, since the general term follows specific terms, *ejusdem generis* is the proper canon of construction.

24

No. 14-30122

C

As the conclusion that Defendants are outside the scope of coverage is reached by the text of § 1115, we need not reach the legislative history. We note quickly, however, that even the legislative history supports our conclusion.

1

Section 1115 was originally enacted as part of an 1838 act, whose title clarified that the act was intended "[t]o provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam."[67] At the time, travel by steamboat was commonplace, but so were steamboat collisions and boiler explosions resulting in the deaths of hundreds of passengers and crewmembers.[68] The 1838 Act aimed to rectify these safety problems[69] by, *inter alia*, imposing steamboat licensing and inspection requirements and placing various obligations or liabilities upon vessel owners, masters, inspectors, captains, pilots, engineers, and others.[70] Section 12 of the 1838 Act was the first predecessor to today's § 1115, providing that

> every captain, engineer, pilot, or other person
> employed on board of any steamboat or vessel
> propelled in whole or in part by steam, by whose

---

[67] Act of July 7, 1838, ch. 191, 5 Stat. 304.

[68] *United States v. O'Keefe* (*O'Keefe I*), No. 03-137, 2004 WL 224574, at *1 (E.D. La. Feb. 3, 2004); *United States v. Holmes*, 104 F. 884, 885 (N.D. Ohio 1900) ("[T]he purpose of the lawmakers was to prevent the constant recurrence of the serious accidents then prevailing in the navigation of the waters of the United States by vessels using steam."); *United States v. Warner*, 28 F. Cas. 404, 408 (C.C.D. Ohio 1848) ("It is a matter of public notoriety, and constitutes a part of the history of the times, that within a short period anterior to the date of this statute, numerous steamboat disasters had occurred in our country, attended with a melancholy loss of human life, under circumstances justifying the conclusion that there was gross negligence, yet without the possibility of proving, either positively or inferentially, a malicious intent."); *In re Charge to Grand Jury*, 30 F. Cas. 990, 990 (E.D. La. 1846) (noting "[t]he frequent loss of human life in consequence of explosions of the boilers of steamboats, of collisions and the burning of steamboats").

[69] *United States v. Ryan*, 365 F. Supp. 2d 338, 344 (E.D.N.Y. 2005).

[70] Act of July 7, 1838, §§ 1-13, 5 Stat. at 304-06.

misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter . . . .[71]

Section 12 had a lower degree of culpability than that required by other manslaughter statutes.[72] In 1864, Congress amended the seaman's manslaughter statute by adding the predecessor of the owner provision, the second category of persons liable under § 1115.[73]

Unfortunately, horrible steamboat accidents continued to occur.[74] "In 1871, Congress significantly overhauled the regulatory regime governing steam-powered vessels, adding provisions for watchmen, safety equipment, vessel design standards, inspection and testing of equipment, and licensing of captains, chief mates, engineers, and pilots."[75] The 1838 Act was repealed,[76] and the seaman's manslaughter provision was reenacted as § 57 of the 1871 Act.[77] Section 57 made minor changes to the seaman's manslaughter statute: it made the first category applicable to those "employed on any steamboat or vessel"[78] and it made the owner provision, the second category, applicable to "any owner or inspector, or other public officer."[79]

---

[71] *Id.* § 12, 5 Stat. at 306.

[72] William Pitard Wynne & Brian Michael Ballay, *Seaman's Manslaughter: A Potential Sea of Troubles for the Maritime Defendant and a Clever Mechanism for Taking Arms Against the Slings and Arrows of Maritime Plaintiffs*, 50 Loy. L. Rev. 869, 895-96 (2004).

[73] Act of July 4, 1864, ch. 249, § 6, 13 Stat. 390, 391 (making "the owner or owners" liable). When Congress initially enacted the owner provision, it did not include ordinary negligence but only "fraud, connivance, misconduct, or violation of law" as the required conduct, unlike the current version of the statute. *Compare id.*, *with* 18 U.S.C. § 1115.

[74] *Ryan*, 365 F. Supp. 2d at 345.

[75] Wynne & Ballay, *supra* note 72, at 889; *see also* Act of Feb. 28, 1871, ch. 100, 16 Stat. 440.

[76] *Id.* § 71, 16 Stat. at 459.

[77] *Id.* § 57, 16 Stat. at 456.

[78] Thus removing the requirement that the vessel be steam-propelled.

[79] *Id.* § 57, 16 Stat. at 456.

No. 14-30122

By 1905, the statute was Section 5344 of the Revised Statutes of the United States. It was broadened again in response to another steamboat accident.[80] The owner provision, the second category, was broadened to apply to "every owner, charterer, inspector, or other public officer" and the word "neglect" was added to the list of acts or omissions which would lead to liability.[81] Additionally, the corporate officer provision, the third category, was added.[82]

Congress then recodified the statute several times, first placing it at § 282 of the new Criminal Code,[83] then, in 1948, at its current location at 18 U.S.C. § 1115.[84] A title was also introduced to the section: "Misconduct or Neglect of Ship Officers."[85] The current version of § 1115 is substantively identical to the 1905 version.[86]

2

This legislative history shows a remarkable continuity for the phrase "[e]very . . . other person employed on any . . . vessel." While the other provisions—such as the owner provision and the corporate officer provision—have been amended several times, this general phrase has remained more or less the same.

The government points to several features of the legislative and drafting history in support of its plain text interpretation. We do not find any convincing. First, the government argues that the 1838 Act and the 1871 Act

---

[80] *Ryan*, 365 F. Supp. 2d at 346; *see also* Act of Mar. 3, 1905, ch. 1454. § 5, 33 Stat. 1023, 1025-26.

[81] *Ryan*, 365 F. Supp. 2d at 346.

[82] *Id.*

[83] Act of Mar. 4, 1909, ch. 321, § 282, 35 Stat. 1088, 1144.

[84] Act of June 25, 1948, ch. 645, § 1115, 62 Stat. 683, 757.

[85] *Id.*

[86] The statute is now in two paragraphs and the explicit reference to "manslaughter" has been deleted.

demonstrate that Congress knows how to choose its words carefully and deliberately. The 1838 Act included different provisions imposing liability on different classes of people. Section 1 was applicable to "owners"; § 2 to "owner, master, or captain"; § 7 to "the master of any boat or vessel, or the person or persons charged with navigating said boat or vessel" propelled by steam.[87] The 1871 Act similarly included different provision imposing liability on different classes of people, such as owners, masters, captains, chief mates, mates, chief engineers, engineers, pilots, watchmen, "persons in command," and "the officer in charge of the vessel for the time being."[88] We agree that Congress can choose its words carefully and deliberately. Indeed, it is for that very reason that the catchall phrase cannot mean everyone employed on the ship. Congress could have easily used the word "everyone" or "all persons" or "all." But it did not do so, and we must give meaning to its words.

Second, the government argues that Congress surely did not mean to include a "navigation" limitation on the general phrase. To begin, it points to § 7 of the 1838 Act which places a duty on a "master" of a vessel powered by steam "or the person or persons charged with navigating said boat or vessel." This express limitation, the government contends, shows that the "navigating" limit was not mean to apply to the first category in § 1115.[89] Next, the government points to the drafting history of § 12 of the 1838 Act. When first introduced in the Senate in December 1837, the provision was limited to "every captain, engineer, pilot, *or other person employed in navigating* any steamboat

---

[87] Act of July 7, 1838, §§ 1-13, 5 Stat. at 304-06.

[88] Act of Feb. 28, 1871, §§ 1-71, 16 Stat. at 440-59.

[89] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

or vessel propelled in whole or in part by steam."[90] The bill was referred to a select committee and reported out with amendment; the provision remained the same except for the addition of a comma between "person" and "employed."[91] The bill was then debated in the Senate and amended in various respects.[92] When the bill was engrossed for a third reading, the "navigating" limitation had been eliminated.[93] The provision now reached "every captain, engineer, pilot, or *other person, employed on board of any steamboat or vessel propelled in whole or in part by steam*."[94] This was the state of the provision when it was enacted into law as § 12 of the 1838 Act, except that the comma between "person" and "employed" was again removed.[95] The removal of the "navigating" language, the government contends, shows that Congress intended no such limitation.[96] Finally, the government also points to some of the Senate debates, though it concedes that none of the debates explained why the "navigating" language had been removed.[97] To our eyes, however, the common attribute required by *ejusdem generis* is not the equivalent of importing the "navigating" term back into the statute. The common attribute is much broader: those individuals involved in the "marine operations,

---

[90] S. 1, 25th Cong., 2d Sess. § 13 (introduced by Sen. Grundy on Dec. 6, 1837) (emphasis added).

[91] S. 1, 25th Cong., 2d Sess. (as reported out of the Senate select committee on Jan. 9, 1838).

[92] Cong. Globe, 25th Cong., 2d Sess. 123-25 (Jan. 22, 1838); *id.* at 128-29 (Jan. 23, 1838).

[93] *Id.* at 129 (Jan. 23, 1838).

[94] *Id.* (emphasis added).

[95] Act of July 7, 1838, § 12, 5 Stat. at 306.

[96] *Russello*, 464 U.S. at 23-24 ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

[97] *See* Cong. Globe, 25th Cong., 2d Sess. 125 (Jan. 22, 1838) (Senator Sevier expressing concern of the broad sweep of the manslaughter provision); *id.* at 124 (Jan. 22, 1838) (Senator Smith speaking of provision as applying to "captain, pilot, engineer, or other person employed in navigating the boat").

maintenance, or navigation of the vessel." Therefore, we are satisfied that our reading of the statute is proper.

Third, the government points to other statutes passed around the same time to argue for its plain text interpretation. The government argues that Congress could have used the word "seamen," but did not do so. The logic of the argument is that "seamen" had a broad meaning, and Congress chose to use an even broader phrase than "seamen." However, this argument fails because "seamen" has nothing to do with the phrase, and the phrase must be read within the context of the statute. The government also points to the committee report of a failed 1840 bill that was meant to amend the 1838 Act.[98] We do not find much meaning in this amendment precisely because Congress did not enact it. Similarly, the government points to two other statutes arguing that they have similar phraseology and their broad scope compels a broad reading of § 1115.[99] We disagree because the government fails to point to any case law holding as such, simply pointing to the plain statutory text.

The legislative history, then, supports a narrow reading of the statute that excludes Defendants from coverage.

---

[98] S. 247, 26th Cong., 1st Sess. (reported by the Senate Committee on Commerce on Mar. 2, 1840); S. Rep. No. 241, 26th Cong., 1st Sess., at 13 (Mar. 2, 1840) ("Any person employed on board of steamboats by whose negligence or misconduct the life of any passenger shall be destroyed, [is] to be considered guilty of manslaughter, and punished by imprisonment.").

[99] Act of Mar. 24, 1860, ch. 8, § 1, 12 Stat. 3, 3 ("[E]very master or other officer, seaman or other person employed on board of any ship or vessel of the United States, who shall, during the voyage of such ship or vessel, under promise of marriage, or by threats, or by the exercise of his authority, or by solicitation, or the making of gifts or presents, seduce and have illicit connexion with any female passenger, shall be guilty of a misdemeanor . . . ."); *id.* at § 2, 12 Stat. at 3-4 ("[N]either the officers, seamen, or other persons employed on board of any ship or vessel bringing emigrant passengers to the United States, or any of them, shall visit or frequent any part of such ship or vessel assigned to emigrant passengers . . . .").

No. 14-30122

D

We turn to some remaining arguments the government proposes in favor of its plain text reading. First, the government points to the statutory purpose. But as discussed above, the statutory purpose indicates that reading § 1115 in light of *ejusdem generis* is appropriate. The statute was enacted to address the dangers of travel by steamboat, and it is persons responsible for that travel that should be held liable under the statute. Defendants were not responsible for the travel of the *Deepwater Horizon.*

Second, the government points to the case law in support of its reading. The government contends that no court has limited the general phrase to apply only to persons employed on a vessel in a "marine operations, maintenance, or navigation" capacity. The government points to cases and their broad language of liability as proof.[100] Defeating this argument is the fact that no case before has dealt with the question before us today, i.e., whether someone on the drill crew of a drilling rig is liable under § 1115. The government argues there have been prosecutions under § 1115 for non-"marine" *activities*.[101] But these prosecutions have been of persons with primarily "marine" functions: the "captain," "engineer," and "pilot." When defining the general term, *ejusdem*

---

[100] *See United States v. LaBrecque*, 419 F. Supp. 430, 435-36 (D.N.J. 1976) ("Section 1115 was, as noted, designed to punish persons employed on commercial vessels carrying persons for hire."); *see also United States v. Holtzhauer*, 40 F. 76, 78 (C.C.D.N.J. 1889); *United States v. Keller*, 19 F. 633, 637 (C.C.D.W. Va. 1884); *United States v. Collyer*, 25 F. Cas. 554, 576 (C.C.S.D.N.Y. 1855); *United States v. Taylor*, 28 F. Cas. 25, 26 (C.C.D. Ohio 1851); *Warner*, 28 F. Cas. at 407.

[101] *See Van Shaick v. United States*, 159 F. 847, 851 (2d Cir. 1908) (prosecution for failure to "maintain an efficient fire drill, to see that the proper apparatus for extinguishing fire was provided and maintained in efficient order and ready for immediate use and to exercise at least ordinary care in seeing that the life-preservers were in a fit condition for use"); *United States v. Beacham*, 29 F. 284, 284-85 (C.C.D. Md. 1886) (prosecution for absence of a rail on a saloon deck, which led to a passenger slipping overboard and drowning).

The government also points to cases involving prosecution under the owner provision which we do not find compelling. *See United States v. Fei*, 225 F.3d 167, 169-71 (2d Cir. 2000); *United States v. Allied Towing Corp.*, 602 F.2d 612, 613 (4th Cir. 1979).

*generis* strongly suggests that the common attribute is a person responsible for the "marine operations, maintenance, or navigation of the vessel." Moreover, the case law actually seems to support Defendants; prosecutions under the first category of § 1115 have been limited to "captains," "engineers," "pilots," and others with responsibilities relating to vessel transport functions.[102] Thus, our focus on the "marine" identities of these actors is not misplaced.

Finally, the government argues that the district court erred in invoking the rule of lenity. "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."[103] The rule "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed."[104] According to the government, there is no ambiguity here in two ways. First, there is no ambiguity in the plain text. Second, even if there were ambiguity in the plain text, there is no ambiguity left after the application of *ejusdem generis*.

---

[102] *See generally United States v. Oba*, 317 F. App'x. 698 (9th Cir. 2009) (captain); *O'Keefe II*, 426 F.3d 274 (captain); *United States v. Thurston*, 362 F.3d 1319 (11th Cir. 2004) (chief officer); *United States v. Hilger*, 867 F.2d 566 (9th Cir. 1989) (captain); *Hoopengarner v. United States*, 270 F.2d 465 (6th Cir. 1959) (speedboat owner and operator); *United States v. Abbott*, 89 F.2d 166 (2d Cir. 1937) (master and chief engineer); *Van Schaick v. United States*, 159 F. 847 (2d. Cir. 1908) (captain); *Holtzhauer*, 40 F. 76 (captain and pilot); *Beacham*, 29 F. 284 (captain); *Keller*, 19 F. 633 (pilot); *In re Doig*, 4 F. 193 (C.C.D. Cal. 1880) (pilot); *Collyer*, 25 F. Cas. 554 (captain, pilot, engineer, captain's clerk, and owner); *United States v. Farnham*, 25 F. Cas. 1042 (C.C.S.D.N.Y. 1853) (captain); *Taylor*, 28 F. Cas. 25 (engineer); *Warner*, 28 F. Cas. 404 (captain, first mate, second mate, and wheelsman); *United States v. Schröder*, No. 06-0088, 2006 WL 1663663 (S.D. Ala. 2006) (captain); *United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) (captain*); LaBrecque*, 419 F. Supp. 430 (captain of non-commercial vessel); *United States v. Vogt*, 230 F. Supp. 607 (E.D. La. 1964) (pilot); *United States v. Meckling*, 141 F. Supp. 608 (D. Md. 1956) (captain); *United States v. Harvey*, 54 F. Supp. 910 (D. Or. 1943) (pilot); *United States v. Knowles*, 26 F. Cas. 800 (N.D. Cal. 1864) (captain). Arguably, the prosecution of the captain's clerk in *Collyer* seems to buck this trend. But we do not put much stock in this one case as the clerk is also described as an "inferior officer." 25 F. Cas. at 564.

[103] *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion).

[104] *Id.*

No. 14-30122

Therefore, the district court erred in applying the rule of lenity. The government misapprehends the district court's order. The district court clearly understood that the rule of lenity is only applied as a last resort. It only held that should there be any remaining ambiguity even after the application of *ejusdem generis*, the rule of lenity dictated that it be resolved in Defendants' favor.

Counterarguments in favor of interpreting § 1115 to cover Defendants have purchase. Yet we are left with textual indeterminacy, as well as the incongruity of applying a statute originally developed to prevent steamboat explosions and collisions on inland waters to offshore oil and gas operations— all approaching a bridge too far. The primary thrust of legislative effect can bring light to the shadows of uncertainty.[105] At some point, and we think it here, the doctrine of lenity takes hold and dismissing this part of the indictment was not error.

VI

The judgment of the district court is AFFIRMED.

---

[105] *See generally Yates v. United States*, No. 13-7451 (U.S. Feb. 25, 2015).